## UNITED STATES v. ADAIR.

### (District Court, E. D. Kentucky.)

**1. COMMERCE—REGULATIONS—CONGRESSIONAL POWER.**

The commerce clause of the federal Constitution empowers Congress to regulate the adjuncts of interstate commerce, as well as such commerce itself.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Commerce, §§ 10–35.]

**2. SAME—STATE REGULATION—IMPLIED CONSENT.**

The implied consent of Congress to state legislation regulating interstate commerce, arising from a failure of Congress to enact similar legis-

lation, is temporary only, and is withdrawn by a congressional enactment covering the same subject-matter.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Commerce, § 8.]

3. SAME—STATUTES—REGULATION OF EMPLOYES.

Act Cong. June 1, 1898, c. 370, § 10, 30 Stat. 428 [U. S. Comp. St. 1901. p. 3211], makes it an offense for an interstate carrier and any officer, agent, or receiver thereof to (1) require any employé or person seeking employment, as a condition thereof, to enter into an agreement not to become or remain a member of any labor organization, or (2) threaten any employé with loss of employment or unjustly discriminate against any employé because of his membership in such a labor organization, or (3) require any employé or person seeking employment, as the condition thereof, to agree to contribute to a fund for charitable, social, or beneficial purposes, and to release the employer from liability for personal injuries, etc., or (4) to attempt or conspire after having discharged an employé, or after his quitting, to prevent him from obtaining employment. *Held*, that such section directly affects one of the adjuncts of interstate commerce, and was within the power of Congress conferred by the commerce clause of the federal Constitution.

4. CONSTITUTIONAL LAW—COMMERCE CLAUSE—LIMITATIONS—DUE PROCESS OF LAW.

The provision of the fifth amendment of the federal Constitution that no person shall be deprived of life, liberty, or property without due process of law, though a limitation on the commerce clause of the federal Constitution, was not infringed by Act Cong. June 1, 1898, c. 370, § 10, 30 Stat. 428 [U. S. Comp. St. 1901, p. 3211], regulating the relations between interstate carriers and their employés; such carriers not being entitled to unrestricted liberty of contract either in their relations with the public or their employés.

5. COMMERCE—INTERSTATE COMMERCE—REGULATION—DISCRIMINATION.

Act Cong. June 1, 1898, c. 370, § 10, 30 Stat. 428 [U. S. Comp. St. 1901, p. 3211], regulating the relations between interstate carriers and their employés, was not unconstitutional as penalizing a common carrier engaged in interstate commerce for discharging an employé because of his membership in a labor organization, or otherwise discriminating against him on that ground without reference to whether he was engaged in interstate or intrastate commerce.

6. EVIDENCE—JUDICIAL NOTICE—SUBJECTS.

A court will take judicial notice that a particular common carrier engaged in interstate commerce also operates trains over its lines solely within the state.

7. CONSTITUTIONAL LAW—EQUAL PROTECTION OF LAWS—FEDERAL CONSTITUTION.

The provisions of the fourteenth amendment of the federal Constitution prohibiting class legislation, applies only to state action amounting to such denial; there being no provision prohibiting Congress from passing laws subject to such objection.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, §§ 649–677.]

J. H. Tinsley, U. S. Atty., and W. R. Harr, Sp. Asst. to Atty. Gen. S. D. Rouse and B. D. Warfield, for defendant.

COCHRAN, District Judge.   This case is before me on demurrer to the indictment.   It was found under section 10 of the Act of June 1, 1898, c. 370, 30 Stat. 428 [U. S. Comp. St. 1901, p. 3211] entitled "An act concerning carriers engaged in interstate commerce and their employees."   That section is in these words:

"That any employer subject to the provisions of this act and any officer, agent or receiver of such employer who shall require any employee, or any person seeking employment, as a condition of such employment, to enter into an agreement either written or verbal, not to become or remain a member of any labor corporation, association or organization; or shall threaten any employee with loss of employment, or shall unjustly discriminate against any employee because of his membership in such labor corporation, association or organization; or who shall require any employee or any person seeking employment, as a condition of such employment, to enter into a contract whereby such employee or applicant for employment shall agree to contribute to any fund for charitable, social or beneficial purposes; to release such employer from legal liability for any personal injury by reason of any benefit received from such fund beyond the proportion of the benefit arising from the employee's contribution to such fund; or who shall, after having discharged an employee, attempt or conspire to prevent such employee from obtaining employment, or who shall after the quitting of an employee, attempt or conspire to prevent such employee from obtaining employment, is hereby declared to be guilty of a misdemeanor and upon conviction thereof in any court of the United States, of competent jurisdiction in the district in which such offense was committed, shall be punished for each offense by a fine of not less than one hundred dollars and not more than one thousand dollars."

The ground of the demurrer is that this section of that act is unconstitutional. In order to appreciate the particulars in which it is claimed that it is unconstitutional, it is necessary to understand that section and the act of which it is a part. That act contains 12 sections. The twelfth section repeals a previous act approved October 1, 1888, c. 1063, 25 Stat. 501 [U. S. Comp. St. 1901, p. 3211], entitled "An act to create boards of arbitration or commission for settling controversies and differences between railroad corporations and other common carriers engaged in interstate and territorial transportation of property or passengers and their employees."

The commission, which, as one of its features, it provided for, composed of three members, two appointed by the President and the other, the Commissioner of Labor, was authorized to examine the causes of the controversies and differences referred to in the title, the conditions accompanying them, and the best means for adjusting them, and required to report the result of their examination to the President and Congress. It is stated, in one of the briefs filed on behalf of the United States, that this act was the result of disturbances growing out of a controversy, or controversies, between railroad companies and interstate commerce and their employés. I have no means of verifying this statement.

After the great railroad strike at Chicago, in June–July, 1894, a commission created under said act examined the causes thereof. It reported the result of its examination to the President November 14, 1894, who transmitted it to Congress December 10, 1894. December 18, 1894, a bill drawn by two of the members of the Commission, at the request of the committee on labor and in line with the recommendations of their report, was introduced in the House. H. R. 8259, 53 Cong. 3d Sess. January 17, 1895, another bill covering the same general subject, approved by the Attorney General, was likewise introduced in the House (H. R. 8556, 53d Cong. 3d Sess.) and subsequently passed by it. It failed to pass the Senate. The House in the Fifty-Fourth Congress passed a like bill (H. R. 268) which failed to pass the

Senate. Similar bills were introduced at the first session of the Fifty-Fifth Congress (S. 122, 1014; H. R. 61) and again at the second session thereof (S. 3662; H. R. 4372), and then enacted into said act of June 1, 1898. That act, therefore, may be said to be an outgrowth of said Chicago strike. In the reports made to the Senate and House, it is characterized and treated as a voluntary arbitration bill. As to the need for the bill, the Senate Committee on Education and Labor, which reported it to the Senate, said:

"The necessity for the bill arises from the calamitous results in the way of ill considered strikes arising from the tyranny of capital or unjust demands of labor organizations, whereby the business of the country is brought to a standstill and thousands of employés, with their helpless wives and children, are confronted with starvation."

The House committee on labor, which reported it to the House, said:

"Persons engaged in interstate commerce, who are most affected by the bill under consideration, have been anxious to secure the enactment into law of such measure as would operate justly and effectively put an end to industrial wars that have resulted from disputes growing out of the questions of wages, hours of labor, and the conditions of employment between the employer and the employé."

The act, however, is something more than a mere voluntary arbitration measure. That may be said to be its principal feature, but it has other features of which section 10 in question herein is one. By section 1 it is provided:

"That this act shall apply to any common carrier or carriers and their officers, agents and employees except masters of vessels and seamen, as defined in section 4612, Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3120], engaged in the transportation of passengers or property, wholly by railroad or partly by railroad and partly by water, for a continuous carriage of shipment, from one state or territory to the United States, or the District of Columbia to any other state or territory of the United States, or the District of Columbia, or for any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States."

Sections 2 to 7 inclusive and section 11 relate to the arbitration feature of the act. The contingency which it is provided is to put it in operation is "whenever a controversy concerning wages, hours of labor, or conditions of employment shall arise between a carrier subject to this act, and the employés of such carriers seriously interrupting, or threatening to interrupt the business of said carrier"; and the arbitration is to be brought about by the endeavor of the chairman of the Interstate Commerce Commission and the Commissioner of Labor upon their failure, at the request of either party to the controversy, to amicably settle it by mediation and conciliation, in getting both parties to sign articles of submission to arbitration and choosing two of the three arbitrators. It is provided that, in signing the articles of submission and in choosing one of said two arbitrators, the employés of the carrier involved in the controversy shall be represented by the labor organization to which they belong, except where the majority of them do not belong to any such organization, in which case they shall be represented by a committee chosen by them, and,

that after an award has been made, it shall not be lawful for such organization to order, counsel or advise any of said employés to quit the service of their employer for three months thereafter without just cause, without giving to said employer 30 days' written notice of an intent so to do.

The other features of the act are contained in sections 8, 9, and 10. By section 8 it is provided that in every incorporation under the provisions of Act June 29, 1886, c. 567, 24 Stat. 86 [U. S. Comp. St. 1901, p. 3204], entitled "An act to legalize the incorporation of National Trade Unions," it must be provided in the articles of incorporation and in the constitution, rules, and by-laws that a member should cease to be such by participating in or by instigating force or violence against persons or property during strikes, lockouts, or boycotts, or by seeking to prevent others from working through violence, threats, or intimidations; that members of such incorporations should not be personally liable for the acts, debts, or obligations of the corporation, nor should such corporations be liable for the acts of members or others in violation of law; and that such corporations might appear by designated representatives before the board created by the act, or in any suits or proceedings for or against any such corporations or their members, in any of the federal courts. By section 9 it is provided that, whenever receivers appointed by federal courts are in the possession and control of railroads, the employés thereof shall have the right, through the officers and representatives of their associations, whether incorporated or not, to be heard upon all questions affecting the terms and conditions of their employment, and that no reduction of wages shall be made by such receivers without authority of the court therefor upon notice to such employés. Section 10, under which the indictment herein was found, has heretofore been quoted in full. It makes it a criminal offense, punishable by fine, for any employing common carrier subject to the provisions of the act, and any officer, agent, or receiver thereof, to do either one of four separate things, to wit: (1) Require any employé or any person seeking employment, as a condition of employment, to enter into an agreement not to become or remain a member of any labor corporation, association, or organization; (2) threaten any employé with loss of employment or unjustly discriminate against any employé because of his membership in such a labor corporation, association, or organization; (3) require any employé or person seeking employment, as a condition of employment, to enter into a contract whereby he shall agree to contribute to any fund for charitable, social, or beneficial purposes, and to release such employer from legal liability for any personal injury by reason of any benefit received from such fund beyond the proportion of the benefit arising from the employé's contribution to such fund; (4) attempt or conspire, after having discharged an employé, or after his quitting, to prevent him from obtaining employment.

These four separate features of this act, to wit, arbitration, forfeiture of membership, hearing by the court, and employing common carrier's conduct, have more than a mere formal unity, i. e., union in one and the same act. The act is not an arbitrary aggregate. Those features of it have a real unity—a unifying thread—an organiz-

ing idea that makes them parts of a real whole. That idea is a common purpose, and that common purpose an avoidance of an interruption to interstate commerce arising from a resort by employés to strikes, lockouts, or boycotts, to redress their real or fancied wrongs. We are driven to this conclusion by a consideration of the provisions of the act in the light of its history.

The provisions made in the first and third features of the act to avoid such an interruption is a settlement of the controversy between the antagonistic parties; in the former, by either the mediation and conciliation of the two chairmen, or the submission to arbitration and award pursuant thereto, and, in the latter, by the decision of the federal court, if the railroad is in the hands of its receiver. That made in the last feature is by penalization of certain conduct of the employing common carrier calculated more or less to provoke a controversy between it and its employés which might result in a strike, lockout, or boycott; and that made in the second feature is forfeiture of membership in such trade unions by employés participating in or instigating force, violence, threats, or intimidation during strikes, lockouts, or boycotts. The forfeiture provided for is of participating in or instigating force, violence, threats, or intimidation during strikes, lockouts, or boycotts, and not for participating in or instigating strikes, lockouts, or boycotts. This feature therefore makes no provision for an avoidance of or interruption to interstate commerce by strikes, lockouts, or boycotts, but only for an avoidance of such interruption by force, violence, threats, and intimidation during strikes, lockouts, and boycotts.

Possibly some favoritism toward the employé can be found in the act. It attaches no hurtful consequences to the employé, under any consideration, for engaging in a strike, lockout, or boycott. Possibly the power to attach such consequences was quite limited. There would seem, however, to be no reason why forfeiture of member-ship could not have been based on a participation in or instigation of a strike, lockout, or boycott, as well as on a participation in or instigation of force, violence, threats, or intimidation during a strike. Possibly, also, this forfeiture of membership feature and the penalizing of certain of the conduct of the employing common carrier would have but little effect in preventing a strike, lockout, or boycott. Yet it cannot be said that they would not have some effect. This idea, therefore, of avoiding an interruption to interstate commerce, pervades the whole act and pervades section 10.

The indictment contains two counts. In each it is alleged that, at the time of the commission of the offense charged, the defendant, William Adair, was master mechanic of the Louisville & Nashville Railroad Company, a common carrier engaged in interstate commerce, and one O. B. Coppage, a member of the Order of Locomotive Firemen, a labor organization, was in its employ as a locomotive fireman. The offense charged in the first count is that the defendant unjustly discriminated against said Coppage because of his membership in said order, by discharging him from said employment on that ground. That charged in the second count is that the defendant threatened said

Coppage with loss of employment because of his membership in said order.

It is claimed that said section is unconstitutional for several reasons. The first one is that no warrant for its enactment is to be found in the federal Constitution. It is denied that it is within subsection 3, § 8, art. 1, conferring on Congress power "to regulate commerce with foreign nations and among the several states and with the Indian tribes," the only provision thereof which it can be claimed justifies it. Is this denial sound? The question whether any given legislation by Congress is within this provision hangs upon two others. What is it that Congress is thereby empowered to regulate? And, what is to regulate it? It is empowered to regulate nothing else and to do nothing else to it than to regulate it.

In considering what it is Congress is thereby empowered to regulate, I will, for convenience sake, limit myself to commerce among the several states, or interstate commerce. Interstate commerce, though perhaps not limited thereto, includes interstate intercourse. We are concerned here with no more. Interstate intercourse is the passage of property, persons, or messages from within one state to within another state. It has certain adjuncts, to wit, the persons corporate or natural and their employés effectuating the passage, the means by which they effectuate it, including the ways, artificial or natural, over which, and the instrumentalities by which, the passage is made, and the charges made for the service rendered. Strictly speaking, these things are not interstate intercourse or commerce. They are merely the adjuncts thereof. Congress, however, is empowered by said provision to regulate the adjuncts of interstate commerce as much so as interstate commerce itself. Its power to regulate them is as extensive, full, and complete as its power to regulate it. The rationale or juridical explanation of this may be debatable. It may be because, within the meaning of said provision, the adjuncts of such commerce are parts thereof, or because to regulate the adjuncts thereof is to regulate it, or because power to regulate the former is granted by necessary implication; to regulate the latter being all that is expressly granted. Or it may be that the power to regulate the adjuncts of interstate commerce is dependent somewhat on the last subsection of said section 8, art. 1, which confers on Congress power to pass laws necessary and proper to carry into execution the powers conferred by the other and preceding sections thereof. But as to the existence of power to regulate the adjuncts of interstate commerce, and as to the extent thereof being as stated, there can be no question.

What I have said as to the nature of interstate commerce and its adjuncts is not put forward as exhaustive or exactly accurate. The matter has not been sufficiently reflected upon for me to be absolutely sure of my ground. It is put forward simply as a working basis, and is deemed sufficient for that purpose. It is a deduction from the relevant decisions of the Supreme Court of the United States. I will not, however, pause to make this good.

What is it, then, to regulate interstate commerce and its adjuncts? This question requires a more extended consideration, as it is here

that it is claimed on behalf of defendant that said section breaks down. It is urged that the power to regulate, conferred by said provision of the federal Constitution, is a power to regulate directly and substantially, and not indirectly, remotely, incidentally, or collaterally, and that said section, in so far as it is a regulation at all, is an indirect, and not a direct, one, and hence not within such power. Two lines of decisions of the Supreme Court of the United States are relied on in support of both these positions, i. e., as to the nature of said power, and as to the nature of the legislation embodied in said section.

One line consists of decisions in cases in which the application of Anti-Trust Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200], was involved, and divides itself into two classes; those where it was held that it did not apply, and those where it was held that it did. Cases of the former class are the following, to wit: United States v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325; Hopkins v. United States, 171 U S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290; Anderson v. United States, 171 U. S. 604, 19 Sup. Ct. 50, 43 L. Ed. 300. Cases of the latter class are the following, to wit: United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; United States v. Joint Traffic Association, 171 U. S. 505, 19 Sup. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136; Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679; Swift & Co. v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518. The other line consists of decisions to the effect that certain state legislation was not an encroachment on the commercial power of Congress, and hence was valid. Amongst the cases cited containing such decisions are the following, to wit: Sherlock v. Alling, 93 U. S. 102, 23 L. Ed. 819; Escanaba Co. v. Chicago, 107 U. S. 678, 2 Sup. Ct. 185, 27 L. Ed. 442; Smith v. Alabama, 124 U. S. 465, 8 Sup. Ct. 564, 31 L. Ed. 508; Kidd v. Pearson, 128 U. S. 1, 9 Sup. Ct. 6, 32 L. Ed. 346; Nashville, etc., Ry. Co. v. Alabama, 128 U. S. 96, 9 Sup. Ct. 28, 32 L. Ed. 352; Hennington v. Georgia, 163 U. S. 299, 16 Sup. Ct. 1086, 41 L. Ed. 166; C., M. & St. Paul Ry. Co. v. Solan, 169 U. S. 133, 18 Sup. Ct. 289, 42 L. Ed. 688; Williams v. Fears, 179 U. S. 270, 21 Sup. Ct. 128, 45 L. Ed. 186.

I cannot accede to the correctness of either position, i. e., as to the nature of said power, or as to the nature of said legislation, or that either finds support in either one of these lines of decision. The position as to the nature of the power conferred on Congress by said constitutional provision interpolates therein the qualifying word "directly." The power conferred thereby is "to regulate" without limitation, and not "to regulate directly." The courts have no right to limit a constitutional provision by inserting a qualifying word therein. They must take it as they find it. If, then, there is such a thing as an indirect regulation of interstate commerce, or its adjuncts—if indeed all regulation is not in its very nature direct—it is hard to conceive why it is not covered by the power conferred. In the case of Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, Mr. Chief Justice Marshall said:

"This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution."

The correct definition of the power, as it seems to me, is that it is the power to enact legislation that directly affects interstate commerce or its adjuncts, and not legislation that affects it or them indirectly only. Or it may be put this way: It is the power to enact legislation which relates to, acts upon, or touches' interstate commerce or its adjuncts or legislation of which either is the subject. Such legislation affects them directly. Legislation which does not relate to, act upon, or touch them, or of which they are not the subject, can only affect them indirectly.

No support of the position of defendant's counsel as to the nature of the power in question can be found in either of the two lines of decisions relied on by them. So far as they throw light on the subject, they bear out the statement as to the nature thereof, which I have put forward. The last line throws less light on it than the first. This is to be expected, as it has to do with state legislation; whereas, the other has to do with congressional legislation. Indeed, the decisions in the Sherlock, Escanaba Company, Smith, Nashville, etc., Railway Company, Hennington, and Solan Cases, and certain expressions in the opinion in some of them, may mislead one as to the nature of that power or the subject of it, if he is not careful. The legislation involved in those cases and held valid was as follows, to wit: In the Sherlock Case, the Indiana wrongful death statute in its applicability to owners of steamboats engaged in interstate commerce; in the Escanaba Company Case, the Chicago bridge ordinance, providing that the draws in the bridge across Chicago river should be closed at certain times in the day, and not kept open longer than 10 minutes at other times; in the Smith Case, the Alabama statute requiring locomotive engineers to be examined and licensed in its applicability to such engineers engaged in interstate commerce; in the Nashville, etc., Railway Company Case, the Alabama statute prohibiting employment in certain capacities by railroad companies of persons afflicted with color blindness, in its applicability to such companies when engaged in interstate commerce; in the Hennington Case, the Georgia statute prohibiting the operation of railway trains on Sunday in its applicability to such as were so engaged; and, in the Solan Case, the Iowa statute prohibiting contracts by railroad companies to exempt them from liability as a common carrier in its applicability to such companies when so engaged.

These decisions may so mislead one as to the nature of said power or the subject of it that if he does not duly consider them he may think that it follows, from the fact that it has been held thereby that a state Legislature has power to enact such legislation, that Congress has no power to enact similar legislation. He, will naturally so think, if he has the idea that in no state of case can a state legislature enter the field of interstate commerce or its adjuncts—that, so far as that field can be occupied at all by legislation, it can only be occupied by congressional legislation, and, properly so, if such idea is correct. For, if in no state of case can a state Legislature enter such field, a

decision that particular legislation enacted by it is valid, necessarily means that it does not by its enactment enter it, and, if by its enactment it does not enter that field, Congress by the enactment of similar legislation would not enter it either, and hence, its action would be beyond its power. But that idea is not correct. It is not true that in no state of case can a state Legislature enter the field of interstate commerce or its adjuncts.

The commercial provision of the federal Constitution does not in terms exclude the several states from the field of interstate commerce and its adjuncts. It simply confers on Congress power to enter it. If they are excluded therefrom, it can only be as an inference from the grant of power to Congress to enter it. It is held that this is a proper inference therefrom, and that the power of Congress to enter that field is exclusive. But it does not follow from this that a state Legislature can in no state of case enter it. It simply follows therefrom that a state Legislature cannot enter it without the consent of Congress. In the matter of consent, it is not necessary that it be expressly or affirmatively given. It may be given by mere silence, or, as it is frequently put, by nonaction or inaction. One of the most difficult problems that the Supreme Court of the United States in its history has had to deal with has been the question as to when such consent is to be implied, and when it is not. It has often been referred to in the opinions of that court as difficult and perplexing, and has frequently caused dissent amongst the justices thereof. The court has always refused to lay down any single and exact rule of decision applicable to all cases that might arise. It lies outside of my path to make any reference to the considerations that have been referred to as having a bearing on the solution of the problem. The outcome of the presentation of the problem to that court has been two lines of decisions. One consists of cases where it has been held that such consent is not to be implied. It begins with the case of Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23. The other consists of cases where it is held that it is to be implied. It begins with the case of Willson v. Black Bird Creek Marsh Co., 2 Pet. 245, 7 L. Ed. 412. It is to this latter line of decisions that the Sherlock and other cases just considered belong. It embraces many others. That the implied consent of Congress to the enactment of such legislation by a state Legislature is the determining factor in the matter of its validity is not brought out in the earlier cases. It is only later that it appears that such is the case. Such consent, when it is implied, is temporary only. It may be withdrawn at any time. Congress, whenever it sees fit to do so, may enter the field in that particular by the enactment of similar legislation. If it does so, it thereby ousts the state legislation. This is recognized in each of the cases referred to above.

In the Sherlock Case, Mr. Justice Field said:

"Until Congress, therefore, makes some regulation touching the liability of parties for marine torts resulting in the death of the persons injured, we are of opinion that the statute of Indiana applies giving a right of action in such cases to the personal representative of the deceased, and that, as thus applied, it constitutes no encroachment upon the commercial power of Congress."

In the Escanaba Company Case, Mr. Justice Field said:

"But until Congress acts on the subject the power of the state over bridges across its navigable streams is plenary."

And, again:

"It is therefore a matter of good sense and practical wisdom to leave their control and management with the states; Congress having power at all times to interfere and supersede their authority whenever they act arbitrarily and to the injury of commerce."

In the Smith Case, Mr. Justice Matthews said:

"The statute of Alabama, the validity of which is drawn in question in this case, does not fall within this exception. It would, indeed, be competent for Congress to legislate upon its subject-matter, and to prescribe the qualifications of locomotive engineers for employment by carriers engaged in foreign or interstate commerce. It has legislated upon a similar subject by prescribing the qualifications for pilots and engineers of steam vessels engaged in the coasting trade and navigating the inland waters of the United States while engaged in commerce among the states; and such legislation is undoubtedly justified on the ground that it is incident to the power to regulate interstate commerce."

In the Nashville, etc., Railway Company Case, Mr. Justice Field said:

"It is conceded that the power of Congress to regulate interstate commerce is plenary; that, as incident to it, Congress may legislate as to the qualifications, duties, and liabilities of employés and others on railway trains engaged in that commerce; and that such legislation will supersede any state action on the subject. But, until such legislation is had, it is clearly within the competency of the states to provide against accidents on trains whilst within their limits."

In the Hennington Case, Mr. Justice Harlan said:

"The argument on behalf of the defendants rests upon the erroneous assumption that the statute of Georgia is such a regulation of interstate commerce as is forbidden by the Constitution, without reference to affirmative action by Congress, and not merely a statute enacted by the state under its police power, and which, although in some degree affecting interstate commerce, does not go beyond the necessities of the case, and therefore is valid, at least until Congress interferes."

And, again:

"The legislative enactments of the states passed under their admitted police powers, and having a real relation to the domestic peace, order, health, and safety of their people, but which by their necessary operation, affect to some extent, or for a limited time, the conduct of commerce among the states, are yet not invalid by force alone of the grant of power to Congress to regulate such commerce, and, if not obnoxious to some other constitutional provision or destruction of some right secured by the fundamental law, are to be respected by the courts of the Union until they are superseded and displaced by some act of Congress passed in execution of the power granted to it by the Constitution."

In the Solan Case, Mr. Justice Gray said:

"The rules prescribed for the construction of railroads and for their management and operation designed to protect persons and property otherwise endangered by their use are strictly within the scope of the local law. They are not in themselves regulations in interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject,

they are to be regarded as legislation in aid of such commerce and as a rightful exercise of the police power of the state to regulate the relative rights and duties of all persons and corporations within its limits."

In the case of N. Y., N. H. & H. R. Co. v. New York, 165 U. S. 628, 17 Sup. Ct. 418, 41 L. Ed. 853, belonging to the same line of decisions as the foregoing, but not cited by defendant's counsel, in which the New York statute forbidding the heating of passenger cars, in that state, by stoves or furnaces kept inside the cars or suspended therefrom, was held valid in its applicability to cars engaged in interstate commerce, Mr. Justice Harlan said:

"Nor is it, within the meaning of the Constitution, a regulation of commerce, although it controls, in some degree, the conduct of those engaged in such commerce. So far as it may affect interstate commerce, it is to be regarded as legislation in aid of commerce, and enacted under the power remaining with the state to regulate the relative rights and duties of all persons and corporations within its limits. Until displaced by such national legislation as Congress might rightfully establish under its power to regulate commerce with foreign nations and among the several states, the validity of the statute, so far as the commerce clause of the Constitution of the United States is concerned, cannot be questioned."

It does not follow, then, from the decisions in those cases, that Congress has no power to enact similar legislation to that involved therein. On the contrary, it follows therefrom—the validity thereof depending on the implied consent of Congress—that it has power to enact similar legislation; and this is expressly recognized in the quotations I have made from the opinions embodying those decisions. Viewed in this light, these decisions, instead of misleading one as to the nature of said power or its subject, will be helpful in enabling one to arrive at a true notion in regard thereto.

Then, as to the expressions in some of said opinions which may mislead one, I have in mind such expressions as that in the quotation made from the opinion of Mr. Justice Gray, in the Solan Case, contained in these words, to wit:

"They are not in themselves regulations of interstate commerce."

And as that in the quotation from the opinion of Mr. Justice Harlan, in the N. Y., N. H. & H. R. Company Case, contained in these words, to wit:

"Nor is it within the meaning of the Constitution a regulation of commerce, although it controls in some degree the conduct of those engaged in such commerce."

Substantially similar expressions may be found in the opinion of Mr. Justice Matthews, in the Smith Case, in these words, to wit:

"But the provisions on the subject contained in the statute of Alabama under consideration are not regulations of interstate commerce. It is a misnomer to call them such."

And, again:

"They are not per se regulations of such commerce. It is only when they operate as such in the circumstances of their application, and conflict with the expressed or presumed will of Congress enacted on the subject, that they can be required to give way to the supreme authority of the Constitution."

And in the opinion of Mr. Justice Harlan, in the Hennington Case, where he speaks of such local laws not being, "within the meaning of the Constitution and considered in their own nature, regulations of interstate commerce, simply because for a limited time, or to a limited extent, they cover the field occupied by those engaged in such commerce."

Such expressions cannot be construed to mean that such legislation, if enacted by Congress, as to interstate commerce or its adjuncts, would not be regulations thereof. Congress would not have power to enact them unless they were. The fact that Congress has power to so enact them, according to the conclusion heretofore reached, settles the fact that they would be such regulations if so enacted. We are now in position to appreciate the value of the decisions which we have been considering in extenso in their bearing on the nature of the commercial power of Congress. The legislation involved therein, if enacted by Congress as to interstate commerce and its adjuncts, would affect them directly. It would relate thereto, act upon, and touch them, and such would be the subject thereof. And it follows that the nature of that power is to enact legislation that will do and be this.

The other two decisions belonging to said second line, cited and relied on by defendant's counsel, tend in the same direction. They are the decisions in the Kidd and Williams Cases. There the state legislation involved was held valid, not because of any implied consent by Congress to its enactment, but because the enactment of such legislation was not an entry within the field of interstate commerce or its adjuncts. In the Kidd Case the legislation involved was the Iowa statute prohibiting the manufacture and sale of intoxicating liquors in that state, and in the Williams Case the legislation involved was the Georgia statute imposing a tax on emigrant agents; that is, persons hiring others in that state to labor in other states. In neither case did the statute affect interstate commerce or its adjuncts directly, or relate thereto or act upon or touch either, or was such the subject thereof. So far as they affected either, they affected it indirectly. The subject-matter of each was something other than interstate commerce or its adjuncts.

We come, then, to the first line of decisions cited and relied on by defendant's counsel as bearing out their claim as to the nature of the commercial power of Congress, and which, I think, bear out the statement which I have put forward as to the nature thereof. As they have to do with congressional legislation, it is to be expected that they will settle beyond question the true nature of that power, and in this we will not be disappointed. The exact question in each of those cases was, not whether Congress might enact any particular legislation under its commercial power, but whether the contract involved therein was in restraint of interstate commerce within the meaning of said anti-trust act, and prohibited by it. That act, however, depended for its validity on said power of Congress, and its meaning—the kind of contracts intended to be covered thereby—was treated in those cases as dependent on the nature of that power. It was held that it covered contracts that affected interstate commerce directly, that related thereto, acted

upon and touched it, and of which it was the subject, and did not cover contracts that affect it indirectly only, and which did not relate thereto, act upon, or touch it, or of which it was not the subject.

In the Knight Case the contract involved affected directly the manufacture of sugar in the state of Pennsylvania. It related to, acted upon, and touched it, and such manufacture was the subject thereof. It affected interstate commerce indirectly only. It did not relate thereto, act upon, or touch it, and such commerce was not the subject of it. It was held not within the act. In the Hopkins and Anderson Cases the contracts involved were between the members of certain live stock exchanges doing business in Kansas City, Mo., embodied in certain rules thereof. Those contracts affected directly the buying and selling of live stock at the stock yards in said city. They did not relate to interstate commerce on live stock, and affected it indirectly only. They were held to be not within the act. In the Trans-Missouri Freight Association, Joint Traffic Association, and Northern Securities Company Cases, the contracts involved were between common carriers engaged in interstate commerce. In the Addyston Pipe Steel Company Case the contract involved was between persons engaged in interstate commerce in iron pipe. And in the Swift and Company Case the contract involved was between persons engaged in interstate commerce in meat. The contract in each instance affected directly the interstate commerce carried on by the parties thereto. It related to such commerce, acted upon, and touched it, and such commerce was the subject thereof. It was held in each instance that the contract was within the act.

It follows from these holdings that the nature of the commercial power of Congress is as I have stated it. Legislation prohibiting contracts that affect interstate commerce or its adjuncts indirectly, or which do not relate thereto, act upon, or touch either, or of which such is not the subject, itself, affects interstate commerce or its adjuncts indirectly, and does not relate thereto, act upon, or touch them, and such is not the subject thereof. It is only legislation prohibiting contracts that affect interstate commerce or its adjuncts directly, or that relate thereto, act upon, or touch either, or of which such is the subject, that itself affects interstate commerce or its adjuncts directly and relates thereto, acts upon, and touches them, and of which such is the subject. In the course of his opinion, in the Addyston Pipe & Steel Company Case, Mr. Justice Peckham frequently refers to contracts within said act as those regulating said commerce directly and substantially, and not those regulating it indirectly, remotely, incidentally, and collaterally. It is this reference, no doubt, that suggested the position taken here as to the nature of said power which I have criticised. There are, however, other references in said opinion which show that what he had in mind was the distinction between contracts and legislation that affected interstate commerce directly, and contracts and legislation that affected it indirectly, which is the correct way, as I submit, of putting the matter.

I have thus arrived at the conclusion as to the nature of the power in question by a generalization of the two lines of decisions cited and relied on by defendant's counsel, as upholding their view thereof. The

generalization might have taken a wider scope by embracing the great number of other decisions involving the validity of state legislation claimed to be an encroachment on the commercial power of Congress not cited or relied on; but to have done so would not have changed the result and unduly lengthened this opinion.

There are not many other decisions of the Supreme Court involving the validity of congressional legislation, whose validity was dependent on that power, that can be considered in arriving at such a conclusion. Until lately, legislation in any way affecting interstate commerce or its adjuncts has been enacted principally by state Legislatures. There has not been a great amount of congressional legislation affecting that matter. It is only in recent times that it has become, to any great extent, the subject of congressional consideration and action. It is just what one would expect, therefore, to find that there are not many decisions of that court dealing with the validity of such legislation. Outside of those already considered, I do not deem it important to make any reference to any such decisions beyond the case of Johnson v. Southern Pacific, 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363. It involved the Safety Appliance Act of Congress of March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]. The constitutionality of the act was assumed therein. It was not attacked. The decision was occupied entirely with its construction. The safety appliance act affected directly an adjunct of interstate commerce, to wit, the cars engaged therein, and that as to their couplers. It related thereto, acted upon, and touched it, and such was the subject thereof.

I am aware that the classic definition of the power in question is to be found in the words of Mr. Chief Justice Marshall, in the case of Gibbons v. Ogden, when he said that the power to regulate commerce is the power "to prescribe the rule by which commerce is to be governed," often subsequently repeated in subsequent decisions of the Supreme Court in substantially the same words. Mr. Justice Harlan, in the case of Champion v. Ames, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492, characterized it as a "general observation." What I have advanced is simply the outcome of a struggle after something more definite. After the great number of decisions of that court involving state and congressional litigation affecting interstate commerce and its adjuncts, the matter ought to be capable of more definite statement. A true generalization thereof is bound to give it.

Having thus reached a conclusion as to the nature of the power in question, we come to the other position of defendant's counsel, to wit, that said section is not within said power; and in disposing of it I will treat its nature as I have defined it, and not as they have. Does it affect interstate commerce, or any of its adjuncts, directly? Does it relate thereto, act upon, or touch either, or is either the subject of it? It must be admitted that it does, and that such is the case. It affects an adjunct of interstate commerce, relates thereto, acts upon, and touches it, and such is the subject of it. That adjunct is common carriers engaged in interstate commerce, and their officers, agents, and employés. It forbids them from doing any of the things covered by that section.

But it may be thought that it is not sufficient that congressional legislation should affect an adjunct of interstate commerce directly, relate thereto, act upon, or touch it, or that it be the subject thereof in order to be valid. To this end it must serve some useful purpose in regard to interstate commerce itself, and not be intended to and in fact accomplish no more than some ulterior purpose. I am not prepared to say that such a view is not correct. There is nothing in the Johnson Case impugning its correctness. Of course, the requirement as to providing couplers was and is beneficial to the manufacturers thereof and to brakesmen; but it is beneficial also to interstate commerce itself. It makes it more attractive for brakesmen to engage therein, by lessening the danger of the business. The necessities of this case do not require that I should dispute the correctness of this view. The section involved herein is not without a beneficial effect upon interstate commerce itself. Its tendency is to prevent an interruption to interstate commerce by reason of strikes, lockouts, and boycotts, and such, as I have already stated, was its intent.

Until recent times, the national attitude towards interstate commerce has been almost solely to prevent its being burdened and interrupted. Such has been the controlling consideration in determining the validity of state legislation affecting it or its adjuncts.

In the case of United States v. Coombs, 12 Pet. 72, 9 L. Ed. 1004, the question involved was whether one could be indicted under the act of Congress entitled "An act more effectually to provide for the punishment of certain crimes against the United States and for other purposes," approved March 3, 1825, for stealing a quantity of merchandise belonging to a ship wrecked on the coast of New York; the goods at the time they were stolen being above high-water mark, and hence outside of the jurisdiction of the United States. It was held that he could. Mr. Justice Story said:

"It [commercial power of Congress] does not stop at the mere boundary line of a state; nor is it confined to acts done on the water, or in the necessary course of the navigation thereof. It extends to such acts done on land which interfere with, obstruct, or prevent the due exercise of the power to regulate commerce and navigation with foreign nations and among the states. Any offense which thus interferes with, obstructs, or prevents such commerce and navigation, though done on land, may be punished by Congress under its general authority to make all laws necessary and proper to execute their delegated constitutional powers. No one can doubt that the various offenses enumerated in the tenth section of the Act are all of a nature which tend essentially to obstruct, prevent, or destroy the due operation of commerce and navigation with foreign nations and among the several states."

In the case of In re Debs, 158 U. S. 565, 15 Sup. Ct. 900, 39 L. Ed. 1092, it was held that the United States, through its Attorney General, had a right to bring a suit to enjoin the interruption of interstate commerce caused by the Chicago strike of 1894.

The anti-trust act of 1890 is another manifestation of this national attitude, and there would seem to be no room to doubt that the tenth section of the act of June 1, 1898, involved herein, is a still further manifestation thereof.

The ground upon which it is claimed by defendant's counsel that said section does not affect directly or, as they have it, regulate directly

that which is the subject of the commercial power of Congress, and hence is not within it, is that "it is merely an intermeddling by Congress with the private relations between master and servant." But it does not deal with the relations between master and servant in the abstract. It deals with the relations between particular masters and servants, to wit, common carriers engaged in interstate commerce and their employés. Such carriers and their employés are the adjuncts of such commerce. Hence said legislation affects those adjuncts directly. It relates thereto, acts upon, and touches them, and they are the subjects thereof. This being so, it is within that power. I conclude, therefore, that said section is not unconstitutional for this reason.

Another reason given in support of the claim that said section is unconstitutional is that, however it may be as to its being within the commercial power of Congress, it is prohibited by the fifth amendment to the federal Constitution, in so far as it provides that no person shall "be deprived of life, liberty or property without due process of law." In other words, it is claimed that that portion of said amendment is a limitation upon the commercial power of Congress, and, though said section comes within the latter, it comes within the former also. It must be conceded that, if this position is correct, then said section is unconstitutional.

Defendant's counsel cite in support of his position the following decisions of the highest courts of the states of Missouri, Illinois, Wisconsin, and New York, to wit: State v. Julow, 129 Mo. 163, 31 S. W. 781, 29 L. R. A. 257, 50 Am. St. Rep. 443; Gillespie v. People, 188 Ill. 176, 58 N. E. 1007, 52 L. R. A. 283, 80 Am. St. Rep. 176; State v. Kreutzburg, 114 Wis. 530, 90 N. W. 1098, 58 L. R. A. 748, 91 Am. St. Rep. 934; People v. Marcus, 77 N. E. 1073, 185 N. Y. 257. In each of these cases a state statute was involved substantially similar to said tenth section, in making it an offense for an employer to discharge or refuse to employ an employé because of his membership in a labor organization. In those cases they were sought to be enforced against persons engaged in private business—in the Missouri and New York cases against a manufacturer, and in the Illinois case against a contractor. It does not appear in what business the defendant was engaged in in the Wisconsin case. In each case the statute was held to be unconstitutional, as in violation of certain provisions of the state Constitution and of the fourteenth amendment to the federal Constitution, in so far as it prohibited state action depriving any person of life, liberty, or property without due process of law.

Counsel for the United States contend that said decisions are erroneous. They maintain that such statutes do not deprive the employer of any lawful right; that they simply protect the rights of employés against invasion by the employer; and that the alleged right of the employer is a right to interfere with the liberty of his employés because they are in his service. This argument merely begs the question. No decision is cited to the contrary of those decisions, except a nisi prius decision in the case of Davis v. State, 30 Wkly. Law Bul. 342. I am not disposed to question the correctness of those decisions. On the contrary, they seem to me based upon sound reasoning. As said by Cooley on Torts, 278:

152 F.—48

"It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason or is the result of whim, caprice, prejudice, or malice. With his reasons, neither the public nor third persons have any legal concern."

But it does not follow from the correctness of these decisions that section 10 is unconstitutional, though it seems quite plausible that, if state legislation of this character is unconstitutional as being in violation of the fourteenth amendment, prohibiting state action depriving any person of life, liberty, or property without due process of law, said tenth section is unconstitutional also, as being in violation of the fifth amendment, prohibiting federal action depriving a person of life, liberty, or property without due process of law. The question may be thought to depend upon whether said fifth amendment is a limitation upon the commercial power of Congress conferred by subsection 3, § 8, art. 1, of the original Constitution.

In the case of Gibbons v. Ogden, Mr. Chief Justice Marshall, in the language heretofore quoted, said:

"This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution."

This language is repeated several times in subsequent cases. It would seem to imply that limitations on said power are to be found in the federal Constitution. I have found nowhere any statement as to what limitations thereon are to be found therein. Nor have I taken the time to study the Constitution with the view of ascertaining for myself those limitations. But it would seem to be reasonable to hold that said amendment is a limitation on said power.

In the case of United States v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, Mr. Justice Harlan, in his dissenting opinion, said:

"In committing to Congress the control of commerce with foreign nations and among the several states, the Constitution did not define the means that may be employed to protect the freedom of commercial intercourse and traffic established for the benefit of the people of the Union. It wisely forbore to impose any limitations upon the exercise of that power, except those arising from the general nature of the government, or such as are embodied in the fundamental guaranty of liberty and property."

It would hardly be held that it was not a limitation on the commercial power of Congress in the matter of depriving a person of his property without due process of law.

In the case of Monongahela Nav. Co. v. United States, 148 U. S. 336, 13 Sup. Ct. 630, 37 L. Ed. 463, Mr. Justice Brewer said:

"But, like the other power granted to Congress by the Constitution, the power to regulate commerce is subject to all the limitations imposed by such instrument, and among them is that of the fifth amendment we have heretofore quoted. Congress has supreme control over the regulation of commerce, but if, in exercising that supreme control, it deems it necessary to take private property, then it must proceed subject to the limitations imposed by this fifth amendment, and can take only on payment of just compensation. The power to regulate commerce is not given in any broader terms than that to establish post offices and post roads; but, if Congress wishes to take private property upon which to build a post office, it must either agree upon the price with the owner, or in condemnation pay just compensation therefor."

If Congress were to pass a law reducing the rates for interstate transportation of passengers or goods to such a point as to amount to a confiscation of the property of a common carrier engaged therein, there, can be no question that such a law would be held to be affected by the fifth amendment. If, then, said amendment limits said power in the matter of depriving a person of his property without due process of law, no reason can be given why it should not be held to limit said power in the matter of depriving a person of his liberty without due process of law.

Yet it has been held in the cases heretofore considered in which the anti-trust act of 1890 has been applied, that it does not limit said power of Congress in prohibiting contracts in reasonable restraint of interstate commerce, whether made by common carriers or others engaged therein. The liberty of private contract in this particular is held not to be preserved by said amendment as against the commercial power of Congress. In the Addyston Pipe & Steel Company Case, Mr. Justice Peckham said:

"The provision in the Constitution does not, as we believe, exclude Congress from legislating with regard to contracts of the above nature, while in the exercise of its constitutional right to regulate commerce among the states. On the contrary, we think the provision regarding the liberty of the citizen is to some extent limited by the commerce clause of the Constitution."

But, conceding, as I think we must do, that said amendment is a limitation, to a certain extent at least, upon the commercial power of Congress, in so far as it prohibits a deprivation of liberty without due process of law, is the legislation in question a deprivation of such liberty within the meaning thereof, and hence unconstitutional? This depends entirely upon what liberty is intended to be protected thereby. It is certainly not the liberty to do what one pleases that is thereby protected from invasion by Congress under its commercial power. We have just seen that the liberty of making reasonable contracts in restraint of interstate commerce are not so protected. Congress, under its commercial power, notwithstanding said amendment, had the right to enact the anti-trust act of 1890 which has been construed to prohibit the making of such contracts, or of any contracts that directly affect by way of restraint such commerce. In the case of Champion v. Ames, 188 U. S. 357, 23 Sup. Ct. 327, 47 L. Ed. 492, it was held that the act of Congress, prohibiting the transportation of lottery tickets from one state to another by an express company, was valid under said commercial power, notwithstanding said amendment. Mr. Justice Harlan there said:

"But surely it will not be said to be a part of any one's liberty, as recognized by the Supreme law of the land, that he shall be allowed to introduce into commerce among the states an element that will be confessedly injurious to the public morals."

In view of these decisions, one must conclude that it is only a liberty that it is reasonable and proper that should not be subject to invasion by Congress under its commercial power that is protected therefrom by said amendment. The matter here, then, comes to this: Is the liberty of a common carrier engaged in interstate commerce to discharge an employé, or to refuse to employ him, because of his member-

ship in a labor organization, such a liberty as that it is reasonable and proper that it should not be interfered with by Congress under its commercial power? We have seen that it has been held that the liberty of one engaged in what may be characterized as a lawful private business to so act is such that it is reasonable and proper that it should not be invaded by state legislation, and that it is protected by the fourteenth amendment; but it does not follow from this that the liberty of such a common carrier to so act is such that it is not reasonable or proper that it should be invaded by Congress under its commercial power. A person engaged in a lawful private business and a common carrier engaged in interstate commerce occupy entirely different positions. The former has a fundamental right upon his own choice to engage in and carry on such business. The latter has no such right. It exercises a public function, and has no right to exercise it except by consent of the national government, express or implied.

The position that a common carrier, such as a railroad for instance, exercises a public function, is upheld by frequent statements in the opinions of the Supreme Court. In the case of Charlotte, C. & A. R. Co. v. Gibbes, 142 U. S. 386, 12 Sup. Ct. 255, 35 L. Ed. 1051, Mr. Justice Field said:

"Though railroad corporations are private corporations, as distinguished from those created for municipal and governmental purposes, their uses are public. They are formed for the convenience of the public in the transportation of persons and merchandise, and are invested for that purpose with special privileges. They are allowed to exercise the state's right of eminent domain, that they may appropriate for their uses the necessary property of others upon paying just compensation therefor, a right which can only be exercised for public purpose, and they assume, by the acceptance of their charters, the obligations to transport all persons and merchandise upon like conditions and at reasonable rates, and they are authorized to charge reasonable compensation for the services they thus perform."

Mr. Justice Brewer, in his dissenting opinion in the case of Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247, said:

"Property is devoted to a public use when, and only when, the use is one which the public in its organized capacity, to wit, the state, has a right to create and maintain, and therefore one which all the public have a right to demand and share in. The use is public, because the public may create it, and the individual creating it is doing thereby and pro tanto the work of the state. The creation of all highways is a public duty. Railroads are highways. The state may build them. If an individual does that work, he is pro tanto doing the work of the state. He devotes his property to a public use."

In the case of L. & N. R. Co. v. Kentucky, 161 U. S. 696, 16 Sup. Ct. 721, 40 L. Ed. 849, Mr. Justice Brown said:

"It has been too often held that railways were public highways, and their functions were those of the state, though their ownership was private, and that they were subject to control for the common good, to be now open to question."

And in the case of United States v. Joint Traffic Association, 171 U. S. 569, 19 Sup. Ct. 32, 43 L. Ed. 259, Mr. Justice Peckham said:

"When the matter of the building of railroads as highways arose, a question was presented whether the state should itself build them, or permit others to do it."

And, again.

"The business of a railroad carrier is of a public nature, and in performing it the carrier is also performing to a certain extent a function of government which, as counsel observed, requires them to perform the service upon equal terms to all."

It follows, then, that a common carrier engaged in interstate commerce is exercising a function of the national government and that by its consent, express or implied. The national government can itself exercise that function. In the case of California v. Central Pac. R. Co., 127 U. S. 1, 8 Sup. Ct. 1073, 32 L. Ed. 150, Mr. Justice Bradley said:

"The power to construct, or to authorize individuals or corporations to construct, national highways and bridges from state to state, is essential to the complete control and regulation of interstate commerce. Without authority of Congress to establish and maintain such highways and bridges, it would be without authority to regulate one of the most important adjuncts of commerce. This power in former times was exerted to a very limited extent; the Cumberland or National Road being the most notable instance. Its exertion was but little called for, as commerce was then mostly conducted by water, and many of our statesmen entertained doubts as to the existence of the power to establish ways of communication by land. But since, in consequence of the expansion of the country, the multiplication of its products, and the invention of railroads and locomotion by steam, land transportation has so vastly increased, a sounder consideration of the subject has prevailed and led to the conclusion that Congress has plenary power over the whole subject. Of course, the authority of Congress over the territories of the United States and its power to grant franchises exercisable therein, are and ever have been undoubted; but the wide power was very freely exercised, and much to the general satisfaction, in the creation of the vast system of railroads connecting the East with the Pacific, traversing states as well as territories, and employing the agency of states as well as federal corporations."

And in the case of Wilson v. Shaw (decided January 7, 1907) 27 Sup. Ct. 233, 204 U. S. 24, 51 L. Ed. ——, the Supreme Court based the right of the United States to build the Panama Canal, which was questioned therein on its commercial power. Mr. Justice Brewer said:

"Again, plaintiff contends that the government has no power to engage anywhere in the work of constructing a railroad or canal. The decisions of this court are adverse to this contention. * * * These authorities recognize the power of Congress to construct interstate highways. A fortiori Congress would have like power with the territories and outside of state lines, for there the legislative power of Congress is limited only by the provisions of the Constitution, and cannot conflict with the reserved power of the states."

That differences in matter of action on its, or his, part follow from this difference of position occupied by a common carrier engaged in state or interstate commerce, and a person engaged in private business, is stated by Mr. Justice Peckham, in the case of United States v. Trans-Missouri Freight Association, 166 U. S. 321, 17 Sup. Ct. 540, 41 L. Ed. 1007, in these words:

"The company [a railroad company] may not charge unreasonable prices for transportation, nor can it make unjust discriminations, nor select its patrons, nor go out of business when it chooses, while a mere trading or manufacturing company may do all these things."

It would seem also that differences in the matter of the right of the state or United States to control follows therefrom. In the case of

Cotting v. Goddard, 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92, Mr. Justice Brewer intimated that there might be a difference in this particular as to property rights. He said:

"Now, in the light of these decisions and facts, it is insisted that the same rule as to the limit of judicial interference must apply in cases in which a public service is distinctly intended and rendered, and in those in which, without any intent of public service, the owners have placed their property on such a position that the public has an interest in its use. Obviously there is a difference in the conditions of these cases. In the one the owner has intentionally devoted his property to the discharge of a public service. In the other he has placed his property in such a position that, willingly or unwillingly, the public has acquired an interest in its use. In the one he deliberately undertakes to do that which is a proper work for the state. In the other, in pursuit of merely private gain, he has placed his property in such a position that the public has become interested in its use. In the one it may be said that he voluntarily accepts all the conditions of public service which attach to like service performed by the state itself; in the other, that he submits to only those necessary interferences and regulations which the public interests require. In the one he expresses his willingness to do the work of the state, aware that the state in the discharge of its public duties is not guided solely by a question of profit. It may rightfully determine that the particular service is of such importance to the public that it may be conducted at a pecuniary loss, having in view a larger general interest. At any rate, it does not perform its services with the single idea of profit. Its thought is the general public welfare. If in such a case an individual is willing to undertake the work of the state, may it not be urged that he in a measure subjects himself to the same rules of action, and that, if the body which expresses the judgment of the state believes that the particular services should be rendered without profit, he is not at liberty to complain? While we have said again and again that one volunteering to do such service cannot be compelled to expose his property to confiscation, that he cannot be compelled to submit its use to such rates as do not pay the expenses of the work, and therefore create a constantly increasing debt which ultimately works its appropriation, still is there not force in the suggestion that as the state may do the work without profit, if he voluntarily undertake to act for the state, he must submit to a like determination as to the paramount interests of the public?"

By referring to this statement I do not commit myself to the idea it may be thought to favor. Rather I would be inclined to think that if a state or the United States declines itself to perform this public function, and permits and, as it were, invites others to perform it, and to make an investment of time, thought, labor, and capital in its performance, such persons should be entitled to a fair and reasonable return on the investment, and that this right could not be taken from them without just compensation. Such may be said to have been a term in the implied understanding of the parties to the permission or invitation at the time of its acceptance.

But it seems to me clear that there is a difference in this particular as to liberty of action by such common carrier or person. Whatever may be the control that a state or the United States has over a person engaged in private business in the matter of his liberty of action, it is reasonable to hold that it has sufficient control over a common carrier in the matter of its liberty of action as to enable it to bring about an efficient performance of the public function with which it is intrusted, and to prevent action on its part that may cause an interruption in the performance thereof, and this on the ground that another term in that

understanding is that it (the common carrier) would perform the public function intrusted to it to the very best advantage, and that the state or United States, as the case might be, reserved to itself the power thereafter to control it to an extent reasonably necessary to secure that result. Amongst the things which Mr. Justice Brown said in the quotation above made from his opinion in the case of L. & N. R. Co. v. Kentucky, had been held too often to be thus open to question, was "that railways were subject to control for the common good." And in the case of Charlotte, C. & A. R. Co. v. Gibbes, supra, Mr. Justice Field referred to what followed from the nature of the function performed by railroad corporations, in these words:

"Being the recipients of special privileges from the state to be exercised in the interest of the public, and assuming the obligations thus mentioned, their business is deemed affected with a public use, and to the extent of that use is subject to legislative regulation. Georgia Railroad & Banking Co. v. Smith, 128 U. S. 174, 179, 9 Sup. Ct. 47, 32 L. Ed. 377. That regulation may extend to all measures deemed essential not merely to secure the safety of passengers and freight, but to promote the convenience of the public in the transaction of business with them, and to prevent abuses of extortionate charges and unjust discrimination. It may embrace a general supervision of the operation of their roads, which may be exercised by direct legislation commanding or forbidding, under severe penalties, the doing or omission of particular acts, or it may be exercised through commissioners specially appointed for that purpose. The mode or manner of regulation is a matter of legislative discretion."

If this line of reasoning is sound, then said section is not within the fifth amendment. It is not reasonable or proper that the liberty of action of a common carrier engaged in interstate commerce in the particulars covered thereby should be beyond the control of Congress under its commercial power. It is not such liberty of action as is protected thereby against the exercise of said power, in that it is action calculated to provoke strikes, boycotts, and lockouts, and cause an interruption and cessation of interstate commerce. The one particular, more than any other, in which such common carrier's liberty of action seems to be within the control of Congress under its commercial power, is in doing that which will, or may, obstruct such commerce. As we have seen, Congress has power to prevent obstruction thereof by contracts reasonably restraining it, entered into between competing common carriers, and so great is its power here that it can prohibit such contracts when made by persons not exercising any public function. Had the United States itself exercised this public function, there can be no question that legislation of this character affecting officials would be entirely legal. There is no reason why the fact that it has intrusted its performance to a private corporation should make any difference. The only possible ground for holding that said section is in violation of the fifth amendment is that it has no real and substantial relation to the free course of interstate commerce. I believe that it has such relation thereto. At the very least I cannot say that it has not. I am constrained, therefore, to hold that said section is not unconstitutional for this reason.

Still another reason urged in support of the position that said section is unconstitutional is that it penalizes a common carrier engaged in interstate commerce for discharging an employé because of his member-

ship in a labor organization, or otherwise discriminating against him on that ground, without reference to the fact whether he is engaged in interstate commerce or solely in intrastate commerce. This court takes judicial knowledge of the fact that the Louisville & Nashville Railroad Company, a common carrier engaged in interstate commerce, and whose master mechanic is charged with a violation of said section in the indictment herein, operates trains over its railroad solely in Kentucky. It operates such trains between Louisville and Lexington, and between Lexington and Maysville, and possibly elsewhere. It is claimed that by said section it is made an offense for said company, or any officer, agent, or employé thereof, to discharge or otherwise discriminate against an employé so engaged solely upon any of said intrastate trains, because of such membership; that it is penalized by the very same words that such discriminating action as to an employé engaged in interstate commerce is penalized; that I have no power to limit this broad language to employés not engaged on intrastate trains; and that therefore the whole section must fall. The cases of U. S. v. Steffens (The Trade-Mark Cases), 100 U. S. 82, 25 L. Ed. 550, U. S. v. Harris, 106 U. S. 629, 1 Sup. Ct. 601, 27 L. Ed. 290, and Baldwin v. Franks, 120 U. S. 678, 7 Sup. Ct. 656, 763, 32 L. Ed. 766, are cited in support of the next to the last of these several propositions. To the same effect are the following cases, to wit: Allen v. Pullman Co, 191 U. S. 171, 24 Sup. Ct. 39, 48 L. Ed. 134; Illinois Central R. Co. v. McKendree, 27 Sup. Ct. 153, 203 U. S. 514, 51 L. Ed. ——.

Of course the doctrine of those cases must be accepted as sound; but they have no application here. It is not likely that the employés of a railway common carrier engaged in interstate commerce, employed solely upon intrastate trains, do not have anything to do in the course of their employment with interstate commerce, i. e., that such employés, though exclusively so engaged, are not in reality also adjuncts of interstate commerce. It is so unlikely that I would not be disposed to overthrow the section in question, if such fact would render it unconstitutional, without further information that such was the case. Said section was enacted in view of existing conditions, and its validity would not be affected by an imaginary, as distinguished from a real, state of things. Take, for instance, the intrastate trains of the Louisville & Nashville Railroad Company, operating between Louisville and Lexington and between Lexington and Maysville. That company operates no interstate trains over said portions of its railroad. In consequence said intrastate trains do an interstate commerce business, and, no doubt, a very large business of that character. Frequently, if not always, the intrastate freight trains operated thereon have on them interstate cars passing between points thereon and points on its Memphis, Nashville, and Knoxville branches to the south of Kentucky. The same is true as to the intrastate passenger trains operated thereon. Beyond question they do a large interstate passenger and express business between said points. Undoubtedly there is a breakage in the passage at Louisville and Paris, but the passage is under one contract and for continuous service. The employés on such trains, therefore, though adjuncts of intrastate commerce, are at the very same time adjuncts of interstate commerce. If, then, Congress, under its com-

mercial power, has no right to penalize a common carrier of interstate commerce for such discriminating action, save only as to interstate employés, the fact that said section applies to such employés who are also intrastate employés cannot invalidate it.

In the case of The Daniel Ball, 10 Wall. 557, 19 L. Ed. 999, Mr. Justice Field said:

"The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one state and some acting through two or more states, does in no respect affect the character of the transaction. To the extent in which each agency acts, in that transportation, it is subject to the regulation of Congress."

The only likelihood of an intrastate train of an interstate carrier not doing any interstate business under any circumstances would be where such train was operated over that portion of the road over which interstate trains ran also. But, again, if it be conceded that there is such a thing in this country as employés of a common carrier engaged in interstate commerce, who are adjuncts solely of intrastate commerce, and that to invalidate an act of Congress penalizing such discriminating action towards such employés would be unconstitutional, there is room to hold that the section in question admits of a construction limiting its application to employés who are wholly, or partially, adjuncts of interstate commerce, notwithstanding the sweeping language in the first section, providing that "the term employés as used in this act, shall include all persons actually engaged in any capacity in train operation or train service of any description." It is a cardinal rule of construction that where legislation admits of two constructions, one of which would uphold and the other invalidate it, the former will be adopted. Such a construction may be justified by the evident intent of Congress to be drawn from its title and all its provisions to keep within its commercial power.

There is nothing in any of said decisions relied on here against such a position. I understand the indictment to charge that Coppage, the employé, whom it is alleged was discriminated against was an employé engaged in interstate commerce. But it is not entirely clear that an act of Congress, penalizing such action towards such employés, would be unconstitutional. It would not be the action of a common carrier engaged in intrastate commerce, that would be so penalized, but the action of the common carrier engaged in interstate commerce, who also did an intrastate business. Such action towards an employé engaged in the intrastate department of its business would be as likely to cause an interruption in or embarrassment of its interstate department as like action towards an employé engaged in the latter.

In the case of Gibbons v. Ogden, Mr. Chief Justice Marshall said:

"The genius and character of the whole government seems to be that its action is to be applied to all the external concerns of the nation, and to those internal concerns which affect the states generally, but not to those which are compliedly within a particular state, which do not affect other states, and with which it is not necessary to interfere for the purpose of execution, of some of the general powers of the government. The completely internal commerce of a state, then, may be considered as reserved to the state itself."

And, again:

"It is obvious that the government of the Union, in the exercise of its express powers (that, for example, of regulating commerce with foreign nations and among the states), may use means that may also be employed by a state, in the exercise of its acknowledged power (that, for example, of regulating commerce within the state). If Congress license vessels to sail from one port to another, in the same state, the act is supposed to be necessarily incidental to the power expressly granted to Congress, and implies no claim of a direct power to regulate the purely internal commerce of a state, or to act directly on its system of police."

It seems to me, therefore, that the section in question herein is not unconstitutional for this reason: A final reason urged in support of the contention that it is unconstitutional is that it is class legislation, in that it confers privileges upon union labor that are not conferred upon nonunion labor. In other words, the claim is that it denies to nonunion labor the equal protection of the laws. But I find no provision in the federal Constitution prohibiting class legislation, i. e., prohibiting Congress from denying one the equal protection of the laws. The provision in the fourteenth amendment applies only to state action amounting to such denial.

I would not, however, commit myself to the proposition that Congress can deny one the equal protection of the laws. It is too serious a matter to dispose of upon the very slight consideration which I have given the matter. The necessities of this case do not require that I should dispose of this question herein. The section in question does not come within such a prohibition, even if there was one affecting Congressional action. Such a prohibition would not prevent all discrimination, but only such as was arbitrary and not reasonable; that is, not based on some reason of public policy. The discrimination here, so far as it exists, is based on a reason of public policy. The purpose of the legislation, as we have seen, was to prevent an interruption of interstate commerce. The discriminating action on the part of a common carrier engaged in interstate commerce towards an employé prohibited by the section is liable to bring about such an interruption. Like discriminating action toward an employé who is not a member of a labor organization is not liable to produce any such result. There is nobody to back him up in his complaints and demands, or means by which he can bring about such interruption.

It will not do to overlook the fact that Congress in enacting the legislation in question viewed it, not from the standpoint of the labor organization, but from its own. That standpoint was the interest of interstate commerce committed to its charge by the federal Constitution. This reason, then, does not meet my approval. I am constrained to hold, therefore, that said section is constitutional. In disposing of the question I have borne along with me two general considerations: One is that I am not concerned with the policy of said legislation—only with its constitutionality. The other is that I have no right to hold an act of Congress unconstitutional, unless it is clearly so. It seems to me that these two considerations, in connection with those handled in detail, are sufficient to demand of me that I uphold said law.

The matter has been considered elsewhere in two cases. In the case of United States v. Hill, an indictment found in the district of Massachusetts under said section in 1899, Judge Lowell overruled a demurrer thereto, and submitted the matter to a jury, which hung. There seems to have been no further trial of the case. He delivered no opinion as to its constitutionality. His action, however, involved its being constitutional. In the case of United States v. Scott (D. C.) 148 Fed. 431, Judge Evans of the Western district of this state, a prosecution against an employé of the Louisville & Nashville Railroad Company, held the section unconstitutional. A comparison of his opinion with this will indicate wherein we differ.

The demurrer is overruled.