UNITED STATES v. SUGAR et al.

(District Court, E. D. Michigan, S. D.   July 10, 1917.)

No. 5875.

1. INDICTMENT AND INFORMATION ⬉125(5½)—OFFENSES—DUPLICITY.

An indictment charged that defendants did unlawfully, willfully, knowingly, corruptly, and feloniously conspire to commit an offense against the United States and to defraud the United States, in violation of Criminal Code (Act March 4, 1909, c. 321) § 37, 35 Stat. 1092 (Comp. St. 1916, § 10201), in that they conspired to induce other persons to refuse to register in accordance with Conscription Act May 18, 1917, c. 15, §§ 5, 6. The indictment clearly showed that defendants were charged with a conspiracy to commit an offense against the United States, and not to defraud it, although it followed the language of said section 37, which denounces, not only a conspiracy to commit an offense against the United States, but one to defraud. *Held*, that the allegations as to defrauding the United States should be rejected as surplusage, and hence the indictment was not bad as charging in a single count two distinct offenses, one a conspiracy to commit an offense against the Conscription Act and the other a conspiracy to defraud the United States.

2. ARMY AND NAVY ⬉40—CONSCRIPTION ACT—VIOLATIONS OF—INDICTMENT.

Under Criminal Code, § 332,[1] providing that whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, commands, or procures its commission, is a principal, an indictment charging defendants with aiding, abetting, counseling, commanding, or procuring the violation of the Conscription Act must allege specifically that the act had been violated, in order to charge an offense.

3. CONSPIRACY ⬉43(6)—INDICTMENT—SUFFICIENCY.

Criminal Code, § 37, declares that if two or more persons conspire to commit an offense against the United States, and one or more of such parties do any act to effect the object of the conspiracy, each shall be punished. Section 332 declares that whoever directly commits any act constituting an offense defined in any law of the United States, or aids,

---

⬉For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[1] Comp. St. 1916, § 10506.

abets, counsels, commands, induces, or procures its commission, is a principal. An indictment charged that defendants unlawfully conspired to commit an offense against the United States, in that they conspired to unlawfully, willfully aid, counsel, and procure persons to violate the provisions of the Conscription Act by failing and refusing to register, and to effect the object of the conspiracy circulated copies of a newspaper containing articles urging its readers to refuse to register. Held, that as the indictment charged a conspiracy to violate the Conscription Act, and did not aver that defendants were liable as principals, it was sufficient, having averred the distribution of the newspaper containing articles urging its readers to refuse to register as an act to effect the object of the conspiracy.

4. CONSTITUTIONAL LAW ⊜⇒48—PRESUMPTION IN FAVOR OF CONSTITUTIONALITY.
   In determining the constitutionality of a statute, as the Conscription Act, the act must be presumed constitutional.

5. CONSTITUTIONAL LAW ⊜⇒83(2)—"INVOLUNTARY SERVITUDE"—WHAT CONSTITUTES.
   Compulsory military service does not constitute involuntary servitude, prohibited by Const. Amend. 13; such amendment being directed against slavery, and not public duties, which may involve compulsory effort on the part of individuals.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Involuntary Servitude.]

6. CONSTITUTIONAL LAW ⊜⇒208(3)—CLASS LEGISLATION—INHIBITION.
   Const. Amend. 14, § 1, declaring that no state shall make or enforce any law which shall abridge the privileges or immunities of citizens, applies only to action by the state, and imposes no inhibition against the federal government; hence the Conscription Act, exempting from military service, though not from registration, certain classes of persons mentioned, is not invalid as class legislation, not being inhibited by any constitutional provision.

7. CONSTITUTIONAL LAW ⊜⇒80(2)—DISTRIBUTION OF POWERS—JUDICIAL POWERS.
   Const. art. 3, § 1, declares that the judicial power of the United States shall be vested in one Supreme Court and in such inferior courts as Congress may from time to time ordain and establish. Const. art. 1, § 8, authorizes Congress to make rules for the government and regulation of the land and naval forces. Const. Amend. 5, declares that no person shall be held to answer for an infamous crime, unless on presentment or indictment of a grand jury, except in cases arising in the land or naval forces. Conscription Act vests in boards to be appointed by the President the power to pass on exemptions contained within the act, but confers no such power on the federal courts. Held, that the act is not invalid, as depriving the courts of the United States of the power to pass on exemptions for the exemption boards, if they be regarded as courts, are military courts, which Congress might create under its power to make rules for the government of land and naval forces.

8. CONSTITUTIONAL LAW ⊜⇒62, 80(1)—DISTRIBUTION OF POWERS—EXECUTIVE.
   Congress cannot delegate either legislative or judicial powers to an executive officer or tribunal, although it may confer upon such officers or tribunals the power and duty to execute and enforce a statute. and as an incident thereto, to determine the existence of facts upon which the application of the statute depends.

9. CONSTITUTIONAL LAW ⊜⇒62, 80(1)—DISTRIBUTION OF POWERS—EXECUTIVE.
   Conscription Act, which provides for exemptions, confers upon the President the power to establish boards of exemption, to review the decisions of such boards, and to make rules and regulations governing registration under the act, and all other rules and regulations necessary to carry

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

out the exemption provisions. There is no provision for review of exemption claims by the federal courts. *Held*, that the act is not invalid, as delegating to the President legislative or judicial powers; such power not being conferred on him or the exemption boards, the exemptions being defined by the act, and the power merely being to determine the facts which will render applicable exemption provisions of the statute.

10. ARMY AND NAVY ⬤➠20—CONSCRIPTION ACT—POWER OF CONGRESS.
   Const. art. 1, § 8, subd. 18, authorizes Congress to make all laws which shall be necessary and proper for carrying into execution all powers vested in the government of the United States or any department thereof. Subdivision 12 confers on Congress power to raise and support armies, but declares that no appropriation of money for that use shall be for a longer term than two years. The Conscription Act provides for the registration of males between prescribed ages and for drafting them into the army. *Held* that, though Const. Amend. 10, declares that powers not delegated to the United States nor prohibited to the states are reserved to the states, Congress has the power to draft or conscript an army; such power being a necessary incident to the power to raise an army.

11. CONSTITUTIONAL LAW ⬤➠42—RIGHT TO RAISE CONSTITUTIONAL QUESTION.
   Constitutionality of Conscription Act May 18, 1917, § 1, authorizing the drafting of the members of the National Guard, cannot be questioned by one unaffected thereby; it being separate and distinct, and separable from the other portions of the act.

12. ARMY AND NAVY ⬤➠20—CONSCRIPTION ACT—DRAFTING MEMBERS OF MILITIA.
   Conscription Act May 18, 1917, § 1, authorizing the President to draft into the military service of the United States, organize, and officer, in accordance with National Defense Act June 3, 1916, c. 134, § 111, 39 Stat. 211 (Comp. St. 1916, § 3045), so far as applicable, any and all members of the National Guard, said members so drafted into such service to serve therein for the period of the present emergency, does not call forth the militia as such, which Const. art. 1, § 8, cl. 15, authorizes for certain purposes only; the section of the National Defense Act providing that the persons so drafted shall, from the date of their draft, stand discharged from the militia.

Maurice Sugar and others were indicted for conspiracy to unlawfully and willfully aid and abet and procure persons to violate the Conscription Act. On motion to quash indictment. Motion denied.

John E. Kinnane, U. S. Dist. Atty., and J. Edward Bland, Asst. U. S. Dist. Atty., both of Detroit, Mich.
Maurice Sugar, of Detroit, Mich., pro se.
Joseph B. Beckenstein, of Detroit, Mich., for defendants.

TUTTLE, District Judge. Defendants have moved to quash the indictment herein, alleging that it charges in a single count two distinct offenses, that the acts of the defendants recited do not constitute an offense against the United States, and that the Conscription Act, on which such indictment is based, is unconstitutional for various reasons stated.

The statute in question is the act of Congress known as the Conscription Act, which was approved on May 18, 1917. The purpose of the act is the raising of national armies for the prosecution of the war against Germany, declared by Congress a few weeks before the enactment of such act, and for that purpose it provides for the regis-

tration of all male persons between the ages of 21 and 30 years, inclusive, on a day and in the manner to be fixed by the President; for the exemption from its provisions of certain classes of persons named therein; for the establishment of exemption boards, to be appointed by the President and to have charge of the application of the exemptions referred to; for the mustering into the national forces of the persons conscripted by the act; and for the making of rules and regulations by the President governing the execution of the provisions relative to such registration and exemptions and the other provisions of the act. Section 5 of the act provides that:

"Any person who shall willfully fail or refuse to present himself for registration or to submit thereto as herein provided, shall be guilty of a misdemeanor and shall, upon conviction by a District Court of the United States having jurisdiction thereof, be punished by imprisonment for not more than one year."

Section 6 provides, among other things, that:

Any person who "evades or aids another to evade the requirements of this act or of said regulations, or who, in any manner, shall fail or neglect fully to perform any duty required of him in the execution of this act, shall, if not subject to military law, be guilty of a misdemeanor, and upon conviction in the District Court of the United States having jurisdiction thereof, be punished by imprisonment for not more than one year."

This indictment charges the defendants with having unlawfully conspired to violate the provisions of the act just quoted, by conspiring to unlawfully aid and abet, counsel, command, induce, and procure other persons to violate said provisions, as hereinafter more fully set forth. The indictment will be found in full at the end of this opinion. See page 439.

[1] The claim that the indictment charges in a single count two distinct offenses, to wit, one a conspiracy to commit an offense against the United States, and the other a conspiracy to defraud the United States, cannot, in my opinion, be sustained. The indictment in charging the offense in general terms follows the language of the statute defining conspiracy (section 37 of the Criminal Code); but, in stating the acts alleged to constitute the crime charged, the indictment makes it quite clear that the defendants are charged with conspiracy to commit an offense against the United States, and not to defraud the United States. I am satisfied that the words in the indictment, "to defraud the United States," are mere surplusage and should be disregarded. Davey v. United States, 208 Fed. 237, 125 C. C. A. 437.

[2, 3] Defendants contend that the object of the conspiracy alleged in the indictment does not constitute any offense against the United States. The indictment charges in substance that the defendants named unlawfully conspired to commit an offense against the United States, in that they so conspired to "unlawfully and willfully aid and abet, counsel, command, induce, and procure" certain persons to violate the provisions of said Conscription Act by failing and refusing to register as required by said act and to evade the requirements of said act, and that in pursuance of such conspiracy and to effect the object thereof the defendants unlawfully and feloniously distributed and circulated copies of a certain newspaper containing articles and

editorials inciting and urging its readers to refuse to register as required by said act.

That the willful refusal or failure to register as required by the Conscription Act is an offense against the United States cannot, of course, be disputed. Section 332 of the Criminal Code provides that:

"Whoever directly commits any act constituting an offense defined in any law of the United States, or aids, abets, counsels, commands, induces, or procures its commission, is a principal."

If, therefore, these defendants aided, abetted, counseled, commanded, induced, or procured the actual violation of said Conscription Act, they themselves thereby violated said act and committed an offense against the United States; and if they unlawfully conspired to aid, abet, counsel, command, induce, or procure the violation of said act, and one or more of them did any act to effect the object of such conspiracy, each of them would be guilty of an unlawful conspiracy to commit an offense against the United States, in violation of section 37 of the Criminal Code, which provides that:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

If this indictment charged the defendants with aiding, abetting, counseling, commanding, inducing, or procuring the violation of the Conscription Act, it would be necessary that it should allege specifically that said act had been actually violated. United States v. Mills, 7 Pet. 138, 8 L. Ed. 636.

The indictment, however, does not charge defendants either with having actually violated the Conscription Act or with having aided, abetted, counseled, commanded, induced, or procured such violation. It charges an entirely distinct offense, namely, an unlawful conspiracy to violate said act by the means and in the manner already pointed out. It will be noted that this conspiracy statute does not make the actual commission of the crime contemplated by the conspirators an essential element of the conspiracy. It is necessary only to prove that after such conspiracy any one of the conspirators did some act "to effect the object of the conspiracy" in order to render such conspiracy a violation of this statute. As was said in United States v. Rogers (D. C.) 226 Fed. 512:

"The commission of the crime of conspiracy is not complete until one or more of the conspirators does some act or acts in execution or furtherance of the conspiracy. These acts are called 'overt acts,' and may be innocent acts in and of themselves."

It is, I think, quite clear that the alleged acts of the defendants in circulating the literature referred to were acts in furtherance of, and done for the purpose of effecting, the object of their conspiracy. It therefore follows that the indictment properly charges a conspiracy to commit an offense against the United States, which, of course, is itself an offense against the United States.

Defendants attack the constitutionality of the Conscription Act on various grounds, which may be conveniently grouped as follows:

(1) That the act is contrary to the Thirteenth Amendment to the United States Constitution, which provides that:

"Neither slavery nor involuntary servitude, except as punishment for crime whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction."

(2) That the act constitutes class legislation.

(3) That the act deprives the courts of the United States of the power to pass upon the exemptions provided for in said act.

(4) That the act vests in the President legislative and judicial powers.

(5) That the act is not an exercise of any power conferred upon Congress by the Constitution, and is therefore void.

(6) That the act calls out the militia for a purpose not authorized by the Constitution.

[4] These contentions will be considered in the order named, and in approaching a consideration of the questions raised it is to be borne in mind that the act must be presumed to be constitutional unless it is clearly shown to be otherwise. Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525. In the language of the Supreme Court in Fairbank v. United States, 181 U. S. 283, 21 Sup. Ct. 648, 45 L. Ed. 862:

"The constitutionality of an act of Congress is a matter always requiring the most careful consideration. The presumptions are in favor of constitutionality, and before a court is justified in holding that the legislative power has been exercised beyond the limits granted, or in conflict with restrictions imposed by the fundamental law, the excess or conflict should be clear."

[5] (1) The contention that compulsory military service constitutes involuntary servitude, within the meaning of the constitutional provision already quoted, cannot, in my opinion, be sustained. Considering the well-known historical circumstances surrounding the enactment of such provision, it seems to me quite clear that it has reference to slavery, or enforced labor, as between private individuals, and was not intended to prevent, or to apply to, the rendition by an individual of duties to the government properly imposed by law. As was said by the Supreme Court in the Slaughter-House Cases, 83 U. S. 36, 21 L. Ed. 394:

"The word 'servitude' is of larger meaning than 'slavery,' as the latter is popularly understood in this country, and the obvious purpose was to forbid all shades and conditions of African slavery. It was very well understood that in the form of apprenticeship for long terms, as it had been practiced in the West India Islands, on the abolition of slavery by the British government, or by reducing the slaves to the condition of serfs attached to the plantation, the purpose of the article might have been evaded, if only the word 'slavery' had been used. * * * We do not say that no one else but the negro can share in this protection. Both the language and spirit of these articles are to have their fair and just weight in any question of construction. Undoubtedly, while negro slavery alone was in the mind of the Congress which proposed the thirteenth article, it forbids any other kind of slavery, now or hereafter."

It certainly cannot be said that military service under the properly constituted authorities constitutes any form of slavery. There are

many public duties which involve compulsory effort of various kinds. Familiar examples are found in the jury system, militia duty, enforced assistance in making arrests, and many other instances which will readily suggest themselves. Surely it cannot be seriously contended that the performance of such duties constitutes slavery or involuntary servitude within the meaning either of the spirit or of the letter of the Constitution. As was pointed out by the court in the case of In re Dassler, 35 Kan. 678, 12 Pac. 130, in overruling a contention that an ordinance requiring the performance of labor upon the public streets in lieu of taxes violated this amendment to the Constitution:

"The power to impose labor for the repair of public highways and streets has been exercised from time immemorial, and comes within the police regulation of the state or city. A commutation of such labor in money in lieu of work, while in the nature of a tax, is not, in common speech or in customary revenue legislation, understood as embraced in the term 'tax.' The power to impose this labor is exercised for public purposes, and the general good and convenience of the community. Cooley, Tax'n (2d Ed.) supra; 1 Desty, Tax'n, 296; Starksborough v. Town of Hinesburgh, 13 Vt. 215; State v. Halifax, 4 Dev. (N. C.) 345; Day v. Green, 4 Cush. (Mass.) 433; 1 Dill. Mun. Corp. (3d Ed.) p. 391. Such labor has never been regarded or construed by any of the authorities as falling within the terms of the Constitution prohibiting slavery and involuntary servitude. Militia service is also compulsory, and, if the theory of the petitioner is correct, such service, when involuntary, is within the terms of section 6 of the Bill of Rights, and the Thirteenth Amendment to the Constitution of the United States. Such, however, is not the case, and we do not think that article 8 of the Constitution of the state conflicts in any way with section 6 of the Bill of Rights or with the Thirteenth Amendment. There are certain services which may be commanded of every citizen by his government, and obedience enforced thereto. Among those services are labor on the streets or highways and training in the militia. As the performance of work, upon an assessment or levy, payable in labor, for the repair of roads or streets, is not the kind of involuntary servitude evidently intended to be embraced within the provisions of the Constitution of the state or of the United States, the power to impose such labor by the Legislature, or a city acting under its authority, cannot well be questioned."

It is entirely clear that this contention is without merit.

[6] (2) It is further contended that the act constitutes class legislation, in that it exempts from military service, although not from registration thereunder, certain classes of persons mentioned therein, and that, therefore, it violates the United States Constitution. No provision of such Constitution has been called to my attention, and I have found none, which would prohibit Congress from making the exemptions complained of. Section 1 of the Fourteenth Amendment to the Constitution provides, among other things, that:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

It will be noted that the language quoted applies only to action by the states, and imposes no inhibition against the action of the federal government. Flint v. Stone Tracy Co., 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312; U. S. v. Adair (D. C.) 152 Fed. 737.

It is therefore unnecessary to consider the questions whether such exemptions are such arbitrary discriminations as to render such statute class legislation, or, if so, whether these defendants, charged as they are with a crime growing out of a refusal to register under the act, are entitled to invoke in their defense the unconstitutionality of an entirely separate and distinct portion of the act, having no relation to the provision requiring registration. This objection is clearly untenable and must be overruled.

[7] (3) It is further urged that the act is unconstitutional, in that it deprives the courts of the United States of the power to pass upon the exemptions provided for in said act; such power being, by the terms of the act, vested in certain boards to be appointed by the President.

Section 1 of article 3 of the United States Constitution provides that:

"The judicial power of the United States shall be vested in one Supreme Court and in such inferior courts as the Congress may from time to time ordain and establish."

Section 8 of article 1 of the Constitution authorizes Congress—

"to make rules for the government and regulation of the land and naval forces."

The fifth amendment to the Constitution, in requiring that no person shall be held to answer for an infamous crime, unless on a presentment or indictment of a grand jury, expressly excepts "cases arising in the land or naval forces."

It is not entirely clear whether this argument is based upon the contention that these boards are not courts established by Congress, or upon the contention that such boards are not courts at all, but are merely subordinate executive tribunals exercising judicial powers. Whichever contention be the basis thereof, such argument is, in my opinion, without merit. It seems manifest that, if these exemption boards be regarded as courts, they are military courts, and therefore not created by virtue of the power granted to Congress by section 1 of article 3, already referred to, but under the power conferred by the fourteenth subdivision of section 8 of article 1 of the Constitution, authorizing Congress to make rules for the government and regulation of the land and naval forces, and that, therefore, their decisions are not required to be subject to review by the federal courts of civil jurisdiction.

"The decisions of the Supreme Court in reference to the power of military tribunals is founded upon the doctrine that the third article of the Constitution has conferred upon Congress the power to create certain federal courts; that another power is conferred upon Congress in the first article of the Constitution, namely, to make rules for the government and regulation of the land and naval forces. These powers are independent of each other. They are derived from different articles of the Constitution. When courts organized under these respective powers are proceeding within the limits of their jurisdiction, it is clear that they must be held free from any interference." Ex parte Dickey (D. C.) 204 Fed. 322.

The following language of the Supreme Court in Dynes v. Hoover, 61 U. S. 65, 15 L. Ed. 838, is, in my opinion, applicable here:

"Among the powers conferred upon Congress by the eighth section of the first article of the Constitution, are the following: 'To provide and maintain a navy;' 'to make rules for the government of the land and naval forces.' And the Fifth Amendment, which requires a presentment of a grand jury in cases of capital or otherwise infamous crime, expressly excepts from its operation 'cases arising in the land or naval forces.' And by the second section of the second article of the Constitution it is declared that: 'The President shall be commander-in-chief of the army and navy of the United States, and of the militia of the several states when called into the actual service of the United States.' These provisions show that Congress has the power to provide for the trial and punishment of military and naval offenses in the manner then and now practiced by civilized nations, and that the power to do so is given without any connection between it and the third article of the Constitution defining the judicial power of the United States; indeed, that the two powers are entirely independent of each other."

The powers exercised by these exemption boards are certainly as military in character as those exercised by the provisional courts established by the President during the Civil War in the territory of the enemy occupied by the federal forces, and the duty of the government to establish such tribunals was, in the language of the Supreme Court in Grapeshot v. Wallerstein, 76 U. S. 129, 19 L. Ed. 651, "a military duty to be performed by the President as commander-in-chief." As was pointed out by the Supreme Court in the case of In re Vidal, 179 U. S. 126, 21 Sup. Ct. 48, 45 L. Ed. 118:

"This court is not * * * empowered to review the proceedings of military tribunals by certiorari. Nor are such tribunals courts with jurisdiction in law or equity, within the meaning of those terms as used in the third article of the Constitution, and the question of the issue of the writ of certiorari in the exercise of inherent general power cannot arise in respect of them."

In so far as this objection is based upon the claim that these exemption boards are executive tribunals exercising judicial powers, it will be disposed of in discussing the contention next considered.

[8, 9] (4) It is further contended that the act is unconstitutional because it vests in the President legislative and judicial powers. Defendants have not specified what powers conferred upon the President by the act are claimed by them to be legislative or judicial, but presumably they intend to refer to the power conferred upon him to establish the boards of exemption already mentioned, to review the decisions of such boards, and to make rules and regulations governing the registration under the act, the organization and procedure of exemption boards, and all other rules and regulations necessary to carry out the exemption provisions of the act.

It is, of course, well settled that Congress cannot delegate either legislative or judicial powers to an executive officer or tribunal. It is equally well settled that Congress may confer upon such officers or tribunals the power and duty to execute and enforce the provisions of a statute, and, as an incident thereto, to determine the existence of the facts upon which the application of the statute depends, and to establish and regulate, consistent with the terms of the statute, the manner and means whereby such statute shall be enforced and its purpose given effect. The principles applicable have been well expressed by Judge Knappen in United States v. Moody (D. C.) 164 Fed. 269, in the following language:

"It is elemental that Congress cannot delegate legislative authority to an executive officer or board, and that accordingly such executive officer cannot amend or extend a law of Congress, so as to make an act unlawful which, but for the action of the executive officer, would be lawful; in other words, that a sufficient statutory authority must exist for declaring an act or omission unlawful. Morrill v. Jones, 106 U. S. 466, 1 Sup. Ct. 423, 27 L. Ed. 267; Field v. Clark, 143 U. S. 649, 691, 12 Sup. Ct. 295, 36 L. Ed. 294; United States v. Eaton, 144 U. S. 677, 687, 12 Sup. Ct. 764, 36 L. Ed. 591. It is however, equally elemental that Congress may constitutionally delegate to an officer or board the determination of a question of fact or state of things upon which the operation of the law is made to depend, or the regulating by administrative rules of the mode of procedure to carry into effect what Congress has otherwise enacted. Field v. Clark, supra; Caha v. United States, 152 U. S. 211, 14 Sup. Ct. 513, 38 L. Ed. 415; In re Kollock, 165 U. S. 526, 17 Sup. Ct. 444, 41 L. Ed. 813; Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525; Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523. In the cases cited by counsel, where the courts have refused to enforce administrative rules adopted by an executive officer or board, it has been found that the regulation in question practically added to or amended the statute (as in Morrill v. Jones, supra; United States v. Maid [D. C.] 116 Fed. 650; United States v. Hoover [D. C.] 133 Fed. 950; United States v. Matthews [D. C.] 146 Fed. 306), or (as in United States v. Eaton, supra) that the punishment for violation of the regulation in question was not provided for by the statute, or that there was no express or necessarily implied authority from Congress to make regulations. Here authority to make regulations has been given in explicit terms, and the statute has expressly declared the violation of such rules to be a criminal offense."

Here, as in Buttfield v. Stranahan, 192 U. S. 470, 24 Sup. Ct. 349, 48 L. Ed. 525:

"We may say of the legislation in this case * * * that it does not, in any real sense, invest administrative officials with the power of legislation. Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute."

I do not think that it can be said that this act confers upon the President any legislative or judicial powers. The act itself completely expresses the purpose of Congress as stated in its title "to authorize the President to increase temporarily the military establishment of the United States." The act fully and clearly provides the general means adopted for carrying out this purpose, and the powers therein conferred upon the President are merely powers to regulate the details necessary to make practically effective the provisions of the act. In the language of the Supreme Court in Ex parte Kollock, 165 U. S. 526, 17 Sup. Ct. 444, 41 L. Ed. 813:

"The regulation was in execution of, or supplementary to, but not in conflict with, the law itself, and was specifically authorized thereby in effectuation of the legislation which created the offense. We think the act not open to the objection urged, and that it is disposed of by previous decisions. United States v. Bailey, 34 U. S. (9 Pet.) 238, 9 L. Ed. 113; United States v. Eaton, 144 U. S. 677, 12 Sup. Ct. 764, 36 L. Ed. 591; Caha v. United States, 152 U. S. 211, 14 Sup. Ct. 513, 38 L. Ed. 415."

The same objection was made to the statute providing for the Civil War selective draft and authorizing the President to make rules and regulations governing the administration thereof, and in overruling such objection the court, in McCall's Case, Fed. Cas. No. 8,669, said:

"The proper inquiry, therefore, is whether they were such regulations as Congress could authorize the President to make. Regulations of some kind were necessary. The details of a compulsory draft could not be simple, and there was no practical experience of such a system. Of course, Congress cannot constitutionally delegate to the President legislative powers. But it may, in conferring powers constitutionally exercisable by him, prescribe, or omit prescribing, special rules of their administration, or may specially authorize him to make the rules. When Congress neither prescribes them, nor expressly authorizes him to make them, he has the authority, inherent in the powers conferred, of making regulations necessarily incidental to their exercise, and of choosing between legitimate alternative modes of their exercise. Whether his authority extends farther, and enables him, without express authority from Congress, to make regulations which, though incidental, are not necessarily so, is a different question. When, however, Congress, in conferring a power, which it may constitutionally vest in him, not only omits to prescribe regulations of its exercise, but, as in the present case, expressly authorizes him to make them, he may, within the limits of, and consistently with, the legislative purpose declared, make any such regulations incidental, though not necessarily so, to the power conferred, as Congress might have specially prescribed."

The same principles apply to the delegation of judicial powers to the executive department. Congress cannot, of course, so delegate such powers. It may, however, confer upon executive officials the power of determining the existence of facts upon the existence of which the execution and application of a statute depends. This power is often essential to the proper enforcement of a statute, and as the exercise of such power is not an exercise of judicial powers, a determination of such facts is not necessarily reviewable by the courts. In the language of the Supreme Court in Zakonaite v. Wolf, 226 U. S. 272, 33 Sup. Ct. 31, 57 L. Ed. 218:

"It is entirely settled that * * * such an inquiry may be properly devolved upon an executive department or subordinate officials thereof, and that the findings of fact reached by such officials, after a fair though summary hearing, may constitutionally be made conclusive."

As was pointed out by the same court in Union Bridge Co. v. United States, 204 U. S. 364, 27 Sup. Ct. 367, 51 L. Ed. 523:

"If the principle for which the defendant contends received our approval, the conclusion could not be avoided that executive officers, in all the departments, in carrying out the will of Congress, as expressed in statutes enacted by it, have from the foundation of the national government, exercised, and are now exercising, powers, as to mere details, that are strictly legislative or judicial in their nature. This will be apparent upon an examination of the various statutes that confer authority upon executive departments in respect of the enforcement of the laws of the United States."

For the reasons stated, it is clear that this objection is not well founded and cannot be sustained.

[10] (5) It is further urged that the act in question is unconstitutional, because it is an attempt by Congress to exercise a power not granted by the federal Constitution, and it is strenuously insisted that the Constitution does not empower Congress to provide for a compulsory military service.

It is a familiar rule that Congress cannot exercise any powers not expressly or by necessary implication conferred upon it by the United

States Constitution. Indeed, the Tenth Amendment to such Constitution expressly states that:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

It is not, however, necessary that a power be expressly granted to Congress by the Constitution in order that the latter may exercise such power. The eighteenth subdivision of section 8 of article 1 of the Constitution authorizes Congress—

"to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

The principle governing the construction and application of this language was well stated by the court in Fairbank v. United States, 181 U. S. 283, 21 Sup. Ct. 648, 45 L. Ed. 862, as follows:

"The words expressing the various grants in the Constitution are words of general import, and they are to be construed as such, and as granting to the full extent the powers named. Further, by the last clause of section 8, art. 1, Congress is authorized 'to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof.' This, construed on the same principles, vests in Congress a wide range of discretion as to the means by which the powers granted are to be carried into execution. This matter was at an early day presented to this court, and it was affirmed that there could be no narrow and technical limitation or construction; that the instrument should be taken as a Constitution. In the course of the opinion the Chief Justice said: "'The subject is the execution of those great powers on which the welfare of a nation essentially depends. It must have been the intention of those who gave these powers to insure, as far as human prudence could insure, their beneficial execution. This could not be done by confining the choice of means to such narrow limits as not to leave it in the power of Congress to adopt any which might be appropriate and which were conducive to the end. This provision is made in a Constitution intended to endure for ages to come, and, consequently to be adapted to the various crises of human affairs. To have prescribed the means by which government should, in all future time, execute its powers, would have been to change, entirely, the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur. To have declared that the best means shall not be used, but those alone without which the power given would be nugatory, would have been to deprive the Legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation, to circumstances.' McCulloch v. Maryland, 4 Wheat. 316, 415, 4 L. Ed. 579, 603. And thereafter in language which has become axiomatic in constitutional construction (4 Wheat. 421, 4 L. Ed. 605): 'We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the Constitution must allow to the national Legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional.'"

The twelfth subdivision of section 8 of article 1 of the Constitution confers upon Congress the power—

."to raise and support armies, but no appropriation of money for that use shall be for a longer term than two years."

It seems to me too plain for argument that where, as here, the power "to raise armies" is conferred in broad terms and without the imposition of any limitations thereon, such power necessarily involves the power to determine the means whereby such armies shall be raised. If, in exercising this expressly conferred power "to raise armies," Congress is to be limited to certain specific means, how, and by whom, can it be determined what means Congress may adopt? Again, if it were possible to determine what means were theoretically proper for the purpose, and Congress were limited thereto, and it then developed that the use of such means was unsuccessful in raising the armies sought, of what force or value would this "power" thus granted to Congress be? Surely a power to raise armies which had not sufficient power to raise them would be a misnomer, a self-contradiction, a legal farce. In the language of In re Griner, 16 Wis. 423:

"The federal government is clothed with ample powers of self-preservation and self-defense, whether assailed by traitors at home or enemies abroad. Full authority in respect to the creation and direction of the national forces is conferred upon Congress."

In McCall's Case, Fed. Cas. No. 8,669, the constitutionality of the Civil War Selective Draft Act was attacked, and in upholding such act the court said, among other things:

"The Constitution of the United States authorizes Congress to raise armies, and also to call forth and organize the militia of the several states. Under this twofold power, both regular national armies and occasional militia forces from the several states may be raised, either by conscription or in other modes. Houston v. Moore, 5 Wheat. (18 U. S.) 17, 5 L. Ed. 19. The power to raise them by conscription may, at a 'crisis of extreme exigency, be indispensable to national security."

The constitutionality of the same act was also involved in Allen v. Colby, 47 N. H. 544, where, in reaching the same conclusion, the court used the following language:

"The Constitution of the United States (article 1, section 8) confers on Congress the power 'to raise and support armies, to make rules for the government of the land and naval forces, to provide for calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions.' Under this grant of power to raise and support armies and call out the militia, there can be no doubt that Congress has power to make and authorize such orders and regulations as may be necessary to prevent those who are liable by law to military service from evading that duty."

I am clearly of the opinion that there is nothing in the Constitution which prohibits the enactment of this Conscription Act. I think the conclusion is irresistible that it is a proper exercise of the power conferred upon Congress to raise armies, and that the means adopted therefor are appropriate and plainly adapted to that end, and therefore fall within the implied powers conferred by the Constitution. I do not deem it necessary to discuss the subject further. The language, however, of the court in the case of Kneedler v. Lane, 45 Pa. 238,

where in an exhaustive and able opinion the constitutionality of the Civil War Conscription Act was upheld, so fully and clearly expresses the principles applicable to this question that I quote therefrom somewhat at length as follows:

"Can the national armies be raised or recruited by draft? That the United States are a nation, and sovereign in the powers granted to them, is not denied. Their national characteristics are seen in the powers themselves, and their supremacy provided for in the instrument. They possess all the functions of a nation in the law-making, executing, and judging powers. We cannot conceive of a nation without the inherent power to carry on war. The defense of person and property is a right belonging by nature to the individual, and to every individual, and is not taken away by association. It therefore belongs to individuals in their collective capacity, whenever thus threatened or assailed. The Constitution, following the natural right, vests the power to declare war in Congress, the representatives of the people. It is noticeable that the Constitution recognizes this right as pre-existing, for it says, to declare war, which presupposes the right to make war. The power to declare war necessarily involves the power to carry it on, and this implies the means, saying nothing now of the express power 'to raise and support armies,' as the provided means. * * * The right to the means carries all the means in possession of the nation. Every able-bodied man is at the call of the government, for assuredly in making war, as there is no limit to the necessity, there can be no limit to the force to be used to meet it. Therefore, if the emergency require it, the entire military force of the nation may be called into service. But the power to carry on war, and to call the requisite force into service, inherently carries with it the power to coerce or draft. A nation without the power to draw forces into the field, in fact would not possess the power to carry on war. The power of war, without the essential means, is really no power; it is a solecism. Voluntary enlistment is founded in contract. A power to command differs essentially from a power to contract. The former flows from authority; the latter from assent. The power to command implies a duty to obey, but the essential element of contract is freedom to assent or dissent. It is clear, therefore, that the power to make war, without the power to command troops into the field, is impotent—in point of fact, is no governmental power, because it lacks the authority to execute itself.

"So much can be argued conclusively, from the fact that the Union is a government of national powers, and has the express authority to declare war and to provide for the common defense and general welfare. But, when we reach the express grant of the means of making war, we find it a general grant of the power 'to raise and support armies,' without any exception as to the extent, the mode, or the means—only that appropriations for the purpose shall not be made for more than two years, which strengthens the grant in every other aspect. Here there is a grant in the broadest language to raise armies, and the purposes (of which I shall say more presently) are vital and fundamental. What is the rule of interpretation to be applied as settled by the federal judiciary? In Gibbon v. Ogden, 9 Wheat. 188, 6 L. Ed. 23, Marshall, C. J., says: 'We know of no rule for construing the extent of such powers other than is given by the language of the instrument which confers them, taken in connection with the purposes for which they were conferred.' Then, speaking of the misapplication of the doctrine of strict construction, in language which seems as if written for this time and occasion, he says: 'If they contend for that narrow construction, which, in support of some theory not to be found in the Constitution, would deny to the government those powers which the words of the grant as usually understood import, and which are consistent with the general views and objects of the instrument—for that narrow construction which would cripple the government, and render it unequal for the objects for which it was declared to be instituted, and to which the powers given as fairly understood render it competent—then we cannot perceive the propriety of this strict construction, nor adopt it as the rule by which the Constitution is to be expounded.' In Martin v. Hunter, 1 Wheat. 304, 4 L. Ed. 97, Mr. Justice Story said: 'This instrument [the Constitution], like any other grant, is to have a reasonable construction, according to the

import of its terms; and when a power is expressly given in general terms, it is not to be restrained to particular cases, unless that construction grows out of the context expressly or by necessary implication.'

"It is conceded that, in construing the Constitution, we must take it as a whole, and not confine the question to a single isolated grant of power. But where a general power is vested in plain and absolute language, without exception or proviso, for high, vital, and imperative purposes, which will be crippled by interpolating a limitation, the advocate of the restriction must be able to point out somewhere in the Constitution a clause which declares the restriction, or a higher purpose which demands it. But by so much more that the life of a nation is greater than the life of an individual, which may be taken to preserve it, so much greater is the high purpose of raising an army to preserve the nation than the protection of the rights of the individual. The minor purpose, when urged as a reason for the limitation, cannot therefore be allowed to control the meaning of the plain language used for the major purpose. Then the inherent powers of a nation to make war for self-preservation, carrying with them all the means of making war effective, the express power to declare war and to raise and support armies, coupled with the express power to pass all laws necessary and proper to carry those powers into effect, all unite in sustaining the power to raise armies by coercion, and these are in turn sustained by the high, vital, and essential purposes of the grant. In addition, the considerations derived from the constitutional duties of the government, and the constitutional restrictions upon the states, enforce this conclusion. If, as inferred only, the Constitution denies coercion, what is its purpose in this? The power to raise armies by draft lies somewhere; if not in the Union, it belongs to the states. But if it abide in the latter only, how is it to be used at all? They cannot declare war, for this power clearly belongs to the nation alone. They cannot make treaties, contract alliances for mutual assistance, make peace, or do any act requiring forces to answer such stipulated duties, for these powers belong to the federal government, and are forbidden to the states. They cannot 'grant letters of marque or reprisal,' 'keep troops or ships of war in time of peace, enter into any agreement or compact with another state or with a foreign power, or engage in war, unless when actually invaded, or in such imminent danger as will not admit of delay.' It does not belong to the states to provide for executing the laws of the Union, or for suppressing insurrections. Nor does it belong to one state to defend others against invasion. Of what use, then, is the compulsory power to raise armies, to the states, as such? But it does belong to the United States to provide for the common defense and general welfare, to declare war, to execute the laws of the Union, to suppress insurrections and repel invasions, to protect the states themselves against invasion and domestic violence, and to guarantee to them a republican form of government. If we deny to the Union the means of raising armies by draft, and leave coercion to the states, how are all these high federal duties to be performed?"

[11, 12] (6) Finally, it is insisted that the act is unconstitutional because it violates the fifteenth clause of section 8, article 1, of the federal Constitution, authorizing Congress "to provide for calling forth the militia to execute the laws of the union, suppress insurrections, and repel invasions." And it is argued that, inasmuch as this provision of the Constitution authorizes Congress to call out the militia only for the purposes thus expressly designated, and as by the present act the militia is called for a purpose other than "to execute the laws of the union, suppress insurrections and repel invasions," therefore the act is an attempted exercise of power in excess of that granted to Congress, and is for that reason invalid.

Section 1 of the act authorizes the President, among other things:

"To draft into the military service of the United States, organize, and officer, in accordance with the provisions of section 111 of said National Defense Act, so far as the provisions of said section may be applicable and not inconsistent

with the terms of this act, any or all members of the National Guard and of the National Guard Reserves, and said members so drafted into the military service of the United States shall serve therein for the period of the existing emergency unless sooner discharged: Provided that, when so drafted the organizations or units of the National Guard shall, so far as practicable, retain the said designations of their respective organizations."

Section 111 of the National Defense Act, just referred to, provides that:

"When Congress shall have authorized the use of the armed land forces of the United States, for any purpose requiring the use of troops in excess of those of the Regular Army, the President may, under such regulations, including such physical examination, as he may prescribe, draft into the military service of the United States, to serve therein for the period of the war unless sooner discharged, any or all members of the National Guard and of the National Guard Reserve. All persons so drafted shall, from the date of their draft, stand discharged from the militia, and shall from said date be subject to such laws and regulations for the government of the army of the United States as may be applicable to members of the Volunteer Army, and shall be embodied in organizations corresponding as far as practicable to those of the Regular Army or shall be otherwise assigned as the President may direct."

It does not appear that any of the defendants are members of the National Guard, or affected by this portion of the statute, and therefore, as this portion of the act is separate and distinct from the other portions thereof and separable therefrom, this objection might be overruled on that ground. Loeb v. Trustees of Columbia Township, 179 U. S. 472, 21 Sup. Ct. 174, 45 L. Ed. 280; Gatewood v. North Carolina, 203 U. S. 531, 27 Sup. Ct. 167, 51 L. Ed. 305; Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, 48 L. R. A. (N. S.) 1134, 15 Ann. Cas. 1034; New York Central & H. R. R. Co. v. United States, 212 U. S. 481, 29 Sup. Ct. 304, 53 L. Ed. 613.

Here, as in the case last cited, it may be said that there is no defendant affected by this part of the act—

"complaining of the constitutionality of the act, if objectionable on that ground, and the case does not come within that class of cases in which unconstitutional provisions are so interblended with valid ones that the whole act must fall, notwithstanding its constitutionality is challenged by one who might be legally brought within its provisions."

Aside, however, from these considerations, I am of the opinion that this objection is clearly without merit. It is by no means clear that, even if by this act Congress had provided for calling out the militia in pursuance of and to make effective its previous declaration of war, it would not have thereby provided for calling forth the militia "to execute the laws of the nation," and in so doing have been strictly within its constitutional powers. It is, however, in my opinion, unnecessary to determine or consider this question, for the reason that this act does not "provide for calling forth the militia."

It will be noted that the act does not purport to provide for calling forth the militia. The portion of the act here involved merely authorizes the President "to draft into the military service of the United States * * * . any or all members of the National Guard," etc. It is then provided that "said members so drafted into the military service

of the United States shall serve," etc. The section of the National Defense Act referred to expressly provides that "all persons so drafted shall, from the date of their draft, stand discharged from the militia." It seems clear that Congress did not, by this language, intend to call out the militia, as such, but only to summon into the service of the United States those individuals who were, before being so summoned, "members" of the National Guard. This, in my opinion, does not violate the constitutional provision so invoked. If the federal government has, as there can be no doubt that it has, the power to draft into the military service of the United States any of its citizens, surely it has power to draft such citizens, notwithstanding the fact that they may previously have been members of the National Guard. Otherwise, it would be in the power of any state or of its citizens to easily evade or nullify any attempt of the federal government to exercise this power and such power might be made wholly nugatory. The constitutional provision authorizing Congress to provide for calling out the militia does not, in my opinion, limit or in any manner affect the broad power expressly conferred upon Congress by the other constitutional provision already considered "to raise" armies. This objection is therefore overruled.

For the reasons stated, the motion to quash the indictment must be, and it hereby is, denied.

### THE INDICTMENT.

The grand jurors of the United States of America impaneled and sworn to inquire in and for the body of the Southern division of the Eastern district of Michigan, upon their oaths present: That heretofore, to wit, on the twenty-sixth day of May, in the year of our Lord one thousand nine hundred and seventeen, and on divers and sundry days subsequent thereto up to and including, to wit, the thirty-first day of May, A. D. 1917, at the city of Detroit, in the Southern division of the Eastern district of Michigan and within the jurisdiction of this honorable court, one Nathan L. Welch, one Maurice Sugar, one Samuel N. Diamond, one Ludwig Bolz, one Robert Westfall, and one Daniel L. Powell, Jr., all late of the city of Detroit, and other persons to these grand jurors at this time unknown, did unlawfully, willfully, knowingly, corruptly and feloniously conspire, combine, confederate and agree together to commit an offense against the United States, and to defraud the United States, in violation of section 37 of the Penal Code of the United States, in this, to wit: That the said Nathan L. Welch, the said Maurice Sugar, the said Samuel N. Diamond, the said Ludwig Bolz, the said Robert Westfall, and the said Daniel L. Powell, Jr., and each of them, did then and there unlawfully, willfully, knowingly, corruptly and feloniously conspire, combine, confederate and agree together and among themselves and with certain other persons to these grand jurors unknown to unlawfully and willfully aid and abet, counsel, command, induce and procure certain male persons whose names are to these grand jurors unknown and being male persons between the ages of twenty-one years and thirty years, both inclusive, who are and shall be subject to registration under the terms and provisions of section 5 of an Act of Congress approved May 18, 1917, entitled "An act to authorize the President to increase temporarily the military establishment of the United States," and in accordance with the regulations prescribed by the President under said act and at the time and place stated in the said proclamation and by public notice, made and issued and promulgated by the President under said act, to unlawfully and willfully fail and refuse to present themselves for registration and to unlawfully and willfully fail and refuse to submit themselves for registration at the time and place and in the manner provided in said act and by said regulations, proclamation and public notice,

and to unlawfully evade the requirements of said act and said regulations in not registering at the time and place and in the manner provided by the said act and regulations, proclamation and public notice. And the grand jurors do further present that in pursuance of said conspiracy, and to effect the object thereof, the said Nathan L. Welch, the said Maurice Sugar, the said Samuel N. Diamond, the said Ludwig Bolz, the said Robert Westfall, and the said Daniel L. Powell, Jr., and each of them, on, to wit, the twenty-seventh day of May, A. D. 1917, at the city of Detroit, in the Southern division of the Eastern district of Michigan, and within the jurisdiction of this honorable court, did unlawfully, willfully, feloniously and knowingly print, publish, issue and circulate and cause to be printed, published, issued and circulated certain literature in opposition to the operation and enforcement of the aforesaid act of Congress and proclamation and regulations promulgated for the enforcement of said law, said literature then and there consisting of a certain issue of a weekly newspaper printed and circulated in said city of Detroit, and being known as the Michigan Socialist, and said issue of said newspaper being the issue dated as follows, to wit: "Detroit, Mich., Sunday, May 27, 1917," and being known as the "Anti-Conscription Edition" thereof, the heading of said issue of said newspaper so printed and published and circulated in said city of Detroit being in the words and figures following, to wit, together with the resolution adopted by the Socialist Party of Detroit, appearing on the first page of said newspaper:

"Anti-Conscription Edition

"The Michigan Socialist

"Published by the Socialist Party of Detroit.

"Vol. 1.          Detroit, Mich., Sunday, May 27, 1917.          No. 46.

"What Socialists Will Do on Registration Day.

"Resolution Adopted by the Socialist Party of Detroit.

"The Government of the United States, in the interest of the capitalist class, has now plunged this country into the mad orgy of death and destruction which is convulsing the nations of the old world, and has forced conscription upon the people of this country.

"We, the Socialist party of Detroit, in joint meeting assembled, reaffirm our allegiance to the principle of international working class solidarity, reiterate our unalterable opposition to this war, and denounce the law just passed to conscript the workers into military service.

"This law forces into 'involuntary servitude' a portion of the population of the country, and we brand it as a violation of the spirit of the thirteenth amendment to the Constitution.

"In the name of the workers, who will bleed but not benefit, we pledge ourselves to oppose registration for conscription by refusing to enroll upon registration day, and we call upon all workers to refrain from signifying their willingness to kill the workers of any other nation.

"Better the freedom of a prison cell than slavery in the interest of commercialism."

And said issue of said newspaper, consisting of four pages of printed matter then and there containing certain articles, editorials and illustrations opposing the enforcement of the aforesaid act of Congress providing for the temporary increase of the military establishment of the United States and known as the Selective Service Act and inciting those subject to the operation of said act to willfully fail and refuse to present themselves for registration or to submit thereto as provided in said act and in the regulations and the President's proclamation pertaining thereto, and exhorting said young men subject to said registration and draft to oppose and refuse to register and particularly inciting and urging all such young men to violate said law and to oppose the enforcement of the same as shown in the leading article printed and published in the first column of the first page of said issue, said leading article being in the words and figures, following, to wit:

"Will You Cringe Like a Coward or Stand up Like a Man?

"Will you follow sheeplike the plutocratic interests sponsoring this war to the European slaughter house to be butchered and maimed so that plutocracy may coin profits out of the misery of the war stricken nations?

"Have you any backbone at all?

"Will you permit military authorities to draft you into involuntary servitude, in contempt of real American tradition?

"Will you stand by with your hands folded and permit the assassination of the constitutional rights of American citizens?

"The hour is at hand when you must either act like a man or forever relinquish your civil and moral right.

"War was declared by the President and Congress in the same arbitrary manner that the Kaiser declared it. You were not consulted about it.

"A draft law has been passed over the protests of American workers. Registration is but a few hours ahead.

"Will you register your willingness to rot in the trenches to accommodate our American plutocracy?

"What will you do?

"You must choose and decide quickly.

"Thousands of Detroiters have decided to refuse to register and refuse to permit the military authorities to conscript them to fight in a war about which they were not consulted. Will you stand with them and join their ranks? Will you stand up like a man for your rights NOW, or will you cringe like a coward when the supreme test of your manhood arrives?

"The question is simple.

"Will you go forth and murder your fellow men, against whom you have no grudge, or will you refuse to participate in the murder party?

"Are you ready to stand with men who will go down in history as the real men of the day, by fighting to maintain such democratic rights and privileges as have been gained through years of sacrifice, or will you sheepishly follow the American murder machine?

"Better a prison cell than the blood of innocent workers on your hands.

"BE A MAN!"

And the further contents of said issue of said newspaper so printed and circulated in the city of Detroit being too voluminous to be set forth at length in this indictment as will more fully appear by reference to the same—contrary to the form, force and effect of the act of Congress in such case made and provided and against the peace and dignity of the United States of America.